# SUPREME COURT — APPELLATE DIVISION — SECOND DEPARTMENT.

## January 24, 1919.

## THE PEOPLE v. CHARLES C. ELSTON.

(1.) RAPE*—EVIDENCE—TESTIMONY OF PROSECUTOR MUST BE CORROBORATED —PROOF ESTABLISHING OPPORTUNITY TO COMMIT CRIME.

A defendant cannot be convicted of the crime of rape upon the uncorroborated testimony of the prosecutor, however satisfactory it may be.

Although the supporting evidence must tend to prove each of the constituent facts of the crime, it need not be positive and direct and is sufficient if it affords proof of circumstances legitimately tending to show the existence of the material facts.

(2.) SAME—PROOF ESTABLISHING OPPORTUNITY TO COMMIT CRIME.

Upon the prosecution of a lawyer sixty-three years of age for the crime of rape upon a girl whom he had known and assisted from babyhood and had made the principal beneficiary under his will after being divorced from his wife, it appeared that the defendant had been intimate with and had acted professionally for the parents of the girl for many years, and that she upon coming to the city where he lived had stayed at his office for considerable periods and was accustomed to go to his sleeping room connected therewith, and that they were constantly together.

*Held,* on all the evidence that the judgment of conviction should be affirmed;

That the undisputed proof outside of the testimony of the prosecutor justified a finding of opportunity in accord with her testimony;

(3.) SAME—FAILURE OF PROSECUTOR TO COMPLAIN.

That her failure to make complaint of the crime until some months thereafter was entirely consistent with the method used — persuasion, not force — and with her testimony that she told no one of the act until after her child was born;

(4.) SAME—ADMISSIBILITY OF EVIDENCE AS TO INTERVIEW BETWEEN DEFENDANT AND PARENTS OF PROSECUTOR.

That testimony as to an interview of her father and mother with the

---

* See notes, Vol. 5, p. 251; Vol. 6, p. 178; Vol. 24, p. 7.

defendant at which he, upon being accused of the crime, asked to marry the girl and stated that then it would be all over, was comptent.

**(5.) ACTS AND CONDUCT OF DEFENDANT AS EVIDENCE OF GUILTY MIND.**

The acts and conduct of a party at or about the time when he is charged to have committed a crime are always received as evidence of a guilty mind, and while in weighing such evidence ordinary caution is required, such inferences are to be drawn from them as experience indicates is warranted.

**(6.) SAME—ALIBI.**

Evidence held insufficient to establish allegations by the defendant as to an alibi and as to impotency.

APPEAL by the defendant, Charles C. Elston, from a judgment of the County Court of Orange county, rendered against him on the 25th day of January, 1918, convicting him of the crime of rape in the second degree.

*Henry Kohl,* for the appellant.

JENKS, P. J.:

When the case was closed and the jury went to their room, they had the testimony of the prosecutor, Rosalie Jansen, that on Saturday, January 27, 1917, she had sexual intercourse with the defendant. However satisfactory her testimony, the defendant could not be convicted if it was unsupported by other evidence. (Penal Law, § 2013.) The supporting evidence must have tended to prove each of the constituent facts of the crime, yet it needed not to be positive and direct, but was sufficient if it afforded proof of " circumstances legitimately tending to show the existence of the material facts." (People v. Plath, 100 N. Y. 594; People v. Adams, 72 App. Div. 166, 172; People v. De Nigris, 157 id. 798, and cases cited.) The discussion in Armstrong v. People (70 N. Y. 43 *et seq.*) is cogent and pertinent.

I shall consider the testimony of the prosecutor, and, second, the supporting evidence. She lived with her parents on a farm

near the city of Middletown. Her parents had been intimate with the defendant for many years. He was a lawyer who had acted professionally for them and had managed some of their affairs. At the time of the alleged crime he was sixty-three years old. He had known Rosalie from babyhood, and had singled her out for devotion manifested by supervision of her bringing up with respect to her health, manners and education. He had constantly made gifts to her and had contributed to the cost of her musical education. He styled himself her uncle. He had made her the principal beneficiary under his will. He had been divorced from his wife. In Middletown he maintained a law office and a connecting room furnished with a table and a bed wherein he slept. For some years, whenever Rosalie came to town, especially for her music lessons on Saturdays, she would go to that office and stay for considerable periods. The defendant solicited and encouraged these visits on the plea that he could care for her and aid her in her studies, as he had been a school teacher. The two were constantly together.

She was accustomed to go to his sleeping room, to which they would fetch fruit and the like. All of these circumstances are established by the testimony of the girl and the defendant. Many of his letters to her were read in evidence. They contain homilies of lofty character, chidings and criticisms. Some of them contain extravagant terms of affection almost mawkish, and some read like the effusions of a dotard lover. Reputable and apparently disinterested witnesses testify to the frequent association of the girl and the man in his office and in the streets, and one to kisses seen "many a time," which were not denied, but admitted. The prosecutor testifies that on Saturday, January 7, 1917, when she was in the office bedroom of the defendant, seated upon his bed, he pushed her over upon the bed and perpetrated the act. The undisputed proof outside of the testimony of the prosecutor justified a finding of opportunity in accord with her testimony. When the jury came to scrutinize

her testimony they could find that it was intelligent, straightforward and consistent even under cross-examination. There was nothing in it that justified the inference that she was immoral with any other man, or depraved or unmoral. There was nothing in it that indicated that her accusation of the defendant was prompted by her desire to shield another, or by hatred or revenge, or that she was the cat's-paw of a blackmailer, or the tool of any one, or that she was the subject of hallucination or delusion.

It is true there was no evidence that she had ever made complaint of the crime until some months thereafter, but it must be remembered that she did not testify to any resistance or violence. Force was not an element of this statutory rape, and the omission of complaint in a rape, the going about as if nothing had happened, was " in effect an assertion that nothing violent had been done." (Wigm. Ev., § 1135.) The omission of complaint was entirely consistent with the method of the crime — persuasion, not force — and with her testimony that she told no one of the act until after her child was born. She testifies that she did not know that she was pregnant — a fact not physically incredible. (Taylor Med. Jur. [7th Am. ed.] 495 *et seq.;* Witthaus & Becker, Med. Jur. vol. 2, pp. 362, 363.) She testifies that when after three months her menses ceased, she went with her mother to a physician who informed her that such cessation was not unusual in one so young.

The jury could have inferred that one of her age did not realize the character of the act, or its possible consequences, but that she supposed that her secret was safe with her, and that she could obey the repeated injunctions of the defendant that she should conceal his conduct with her. And the jury also had before them her testimony that after the birth of her child she had at first declared that the defendant was not its father; that after she was taken to Monticello by the probation authorities she had repeated that statement; and that only after she had

been at Monticello two days did she make the formal written accusation of the defendant. But the jury could consider that she had never named any other person, but had said that the father was a man unknown, and that it was not unnatural that she should attempt to shield the defendant in response to the repeated injunctions of one who was not a mere acquaintance or an advising friend, but her life-long benefactor who had constituted her the principal beneficiary of his will, as she well knew. Such testimony went to the question of her credibilty.

I come now to consider the supporting evidence.

The material facts are defendant's intercourse with the girl, not his wife, and then under the age of eighteen years. (Penal Law, § 2010.) Her sexual intercourse with some male on January 27, 1917, is supported by the testimony of the attendant physician as to the birth of her child on October 18, 1917, and by the period of gestation. (People v. Farina, 134 App. Div. 110, and cases cited; Rex v. Luffe, 8 East, 202; Chamberlayne Modern Law of Ev., § 770; Elliott Ev., § 68.) Her testimony that she was not the wife of the defendant and that at the time of the alleged crime she was under eighteen years of age is supported even by the testimony of the defendant himself. Her testimony that the defendant was the man is supported by the testimony of her father and mother as to an interview between them and the defendant.

But the defendant contends that this testimony last mentioned was not evidence, and for that reason I consider the point at some length. Rosalie had kept her pregnancy secret even from her parents. After her child was born, in October, 1917, she said that the defendant was not its father. When she was taken in November, 1917, to Monticello by the probation authorities, she at first repeated that statement, but after two days she made a formal statement in writing in accusation of the defendant. This accusation was made first on November 26, 1917. The father and mother, who were of a walk in life lower than that

of the defendant, but who had been on intimate terms with him for years, went to the defendant's office on November 28, 1917. The mother's version of the interview is: "I said, 'Mr. Elston, Rosalie says you are the father of her child,' and he says ' She says I am not the father of her child.' And then Mr. Jansen said that she told him up to Monticello. He says 'You are the father of the child. What are you going to do about it?' And he said 'Let me marry the girl.' Q. What, if anything, else was said? A. And Mr. Jansen said 'No,' and told me to come on. Q. And then you left after he had asked permission to marry her? A. Yes." The father's testimony is: "She (i. e., his wife) say, ' Rosalie say you are the father of her baby, of her child,' and he says ' She don't say so.' And then he say ' Please let me marry her,' and I say ' No.' And so he say that to me three times, ' Please let me marry her then it will all be over.' Then I say 'No.' I say ' She's bad enough off now without marrying her to a man sixty-three or four years old '— the kid is only fourteen, and I pushed my wife out of the door and we went."

It is well settled that " the acts and conduct of a party at or about the time when he is charged to have committed a crime, are always received as evidence of a guilty mind, and while in weighing such evidence ordinary caution is required, such inferences are to be drawn from them as experience indicates is warranted." (Greenfield v. People, 85 N. Y. 75.) In People v. Conrow (200 N. Y. 356, 25 N. Y. Crim. 324) the court say, per CHASE, J.: " Declarations or statements made in the presence of a party are not received as evidence in themselves but for the purpose of *ascertaining the reply the party to be affected makes to them.* They are only competent when the person affected hears and fully comprehends the effect of the words spoken, and when he is at full liberty to make answer thereto, and then only under such circumstances as would justify the inference of assent or acquiescence as to the truth of

the statement by his remaining silent. (People v. Kennedy, 164 N. Y. 456, 15 N. Y. Crim. 241; People v. Smith, 172 N. Y. 210, 17 N. Y. Crim. 39; People v. Cascone, 185 N. Y. 317, 20 N. Y. Crim. 175.) " (See, too, Elliott Ev., § 2723; People v. Ferrara, 199 N. Y. 414; Donnelly v. State, 26 N. J. Law, 601, 613; Commonwealth v. Trefethen, 157 Mass. 180, 198.) The defendant at this interview did not remain silent or refuse to answer. He did not deny the accusation, but he responded to it, avowedly made upon the authority of Rosalie, by the denial of that authority — " She (Rosalie) says I am not the father of her child " — evidently referring to Rosalie's *original* exculpation of him. But when the father informed him that Rosalie *had* accused him at *Monticello*, and of course at a later time than that of his exculpation, and but two days before the interview, with the inquiry as to what he would do about it, defendant said, " Let me marry the girl," and not only this but added, " then it will all be over." He made no denial of the accusation at any time. Was there not in the reply both to the accusation and to the inquiry as to what he was going to do about it, some evidence that might indicate his guilt? Could not the jury infer that the offer to marry the girl, *not at the outset when he naturally could rely upon her exculpation*, but only after he was informed of her accusation, was made because he was guilty? Why should he declare that if he married the girl, " then it will all be over," if he was not the guilty man? It might be argued that even if the defendant was innocent he could state that it would all be over if he then married the girl, meaning thereby only all that marriage with a woman under such circumstances could accomplish — make her " an honest woman " in the eyes of the world, give her and her child a protector and afford to them a decent future. But did not the words permit a different inference and one that more satisfies those words? If he was the father of the child, they indicated the readiness to make the highest *reparation*

possible.  Again, if the defendant were guilty, the words might signify that it would be " all over " so far as anything would be done with respect to the defendant.  It does not appear that in the two days that intervened the accusation at Monticello and the interview any legal proceedings had been decided upon. But the offense was a crime, it had been made known at Monticello, the defendant was a lawyer and he must have realized that legal proceedings of some kind, criminal or civil, would naturally follow.  If he became the husband of the girl, he was legally safe from a charge of seduction.  (People ex rel. Scharff v. Frost, 198 N. Y. 112.)  He might have the strongest reason to believe that he would not be punished criminally, and that no civil proceeding could or would be instituted.

The learned and able counsel for the defendant relies upon People v. Page (162 N. Y. 274, 14 N. Y. Crim. 513).  In Page's case the woman with whom the complainant had remained for a few days after the alleged rape testified that she (the witness) told the defendant that the complainant " claimed he had committed the crime of rape upon her," and defendant did not deny the story.  The court states the question:  " A man is informed by a third person that a woman is circulating a story that he had committed rape upon her.  He does not take the trouble to deny the story, and, according to the ruling in this case, his omission in that regard is evidence against him to prove that he is guilty of the crime charged."  The proposition of the court was that it would be an anomaly that when the law permitted the defendant to stand mute in open court without prejudice, there was a penalty if he did not "deny neighborhood gossip."  Two of the members of the court concurred in the opinion, two concurred in the result, one dissented and one did not vote.  Professor Wigmore thinks that the dicision is " unsound."  (Note to § 1072 in Wigmore on Evidence, vol. 2, p. 1256.)  I would not go to that extent.  If the decision be strictly limited to the facts in that case, it may be discriminated

from the case at bar. The court in Page's Case (*supra*) was avowedly dealing with the omission of the defendant to " deny neighborhood gossip " detailed to him, and held that such omission did not afford evidence of guilty silence. The distinction between Page's case and the case at bar is that in the present case the parents of the girl, her natural protectors, told defendant that their child had made a direct accusation, and asked him what he was going to do about it. And the defendant did not remain silent, or omit or refuse to answer, but took part in the conversation, first by declaration that the girl herself had exonerated him, and then, when informed that there was proof by the accusation from the girl, by making offer to marry her, with the statement that then it would all be over. Here was not mere omission to deny " neighborhood gossip," but participation in the interview, statements and answers under a charge made by the father and mother of the young girl under circumstances of gravity less only to formal accusation of the authorities of the law. Even silence under such circumstances is not the silence considered in Page's case. (See, too, People v. Smith, 172 N. Y. 233, 17 N. Y. Crim. 39.) Indeed, there is strong authority under such conditions that the mere omission to deny affords some circumstantial evidence. (Chamberlayne Modern Law of Ev., § 1395; Commonwealth v. Coughlin, 182 Mass. 558, 565; Hickey v. Campion, 6 Ir. Rep. C. L. 557; Bessela v. Stern, L. R. 2 C. P. Div. 265, 271; Weidemann v. Walpole, L. R. [1891] 2 Q. B. 534, 539.) In Commonwealth v. Trefethen (157 Mass. 198) the court say: " It is obvious that, when a defendant has replied to a statement made to him, which, if true, tends directly or indirectly to show that he is guilty of the crime charged, and the reply is not an unequivocal affirmation or denial of the truth of the statement, difficult questions must often arise in determining whether the reply has any such tendency to show a consciousness of guilt on his part as will warrant its admission as evidence against him.

Perhaps a certain discretion must be left to the presiding judge or judges in view of all the circumstances of the case."

When the jury came to consider the interview of November twenty-eighth, they had the testimony of the denfendant that it had taken place, and that the parents' version of their words was substantially correct. Thus they had before them words of direct accusation of the defendant, and an inquiry as to the defendant's intentions, and they had the omission of the defendant to testify that he then denied any sexual relations with the girl, his testimony that at least marriage was mentioned, and the circumstance that his version of the interview did not involve a direct denial of his fatherhood, although, of course, it was implied in his statement that if he was the father he would marry her, not followed by any promise that he would do so.

Defendant's denial of the sexual intercourse was not supported save as he established his alibi.

As to the alibi, he testifies that he had to pay his taxes on Monday or Tuesday, January twenty-ninth or thirtieth, and that he told Mr. Edgar that he had to go to his farm to collect some more money in order to pay his taxes Monday or Tuesday; that he would leave his office open, and that he asked Mr. Edgar to look after it. Defendant testifies that he went to the farm to see if he could get something, as his tenant, Mrs. Leach, owed him $100 for hay and rental; that he went to Bloomingburg to his upper farm to collect money; that the train left at ten-forty-seven A. M., and he came home a little after four o'clock. He testifies that he went to see Mrs. Leach, and when asked whether he met " anyone else " he answers that he met Mr. Matthew Davidson at the station and had quite a conversation with him. Mrs. Leach was not called as a witness, although the defendant testified to her present whereabouts, nor was her absence accounted for. The same is true of Mr. Davidson so far as the omission to call him or to ex-

plain his absence. Neither the tax bills nor any check or receipt is produced, although the defendant did attempt to read in evidence a stub in his check book of January thirtieth. Mr. Edgar testifies that he had an office on the side of the hall opposite to the office of the defendant, with a stairway coming up between them, and he details the conversation with the defendant as to his proposed absence on January twenty-seventh. He testifies that it *must have* been the twenty-seventh, as the taxes had to be paid. He " thought " — he was " positive " that was the day. Mr. Edgar cannot state positively when defendant left defendant's office, but it was some time between nine and ten o'clock A. M. The witness did not see the defendant again on that day, although the witness remained in his office until " probably half-past five or six o'clock." And he testifies that defendant was not in defendant's office during any portion of the afternoon, and that he " didn't see anything " of the complaining witness on that day. On cross-examination he says that he did not stay in defendant's office at all on that day, the door was open part of the time, " passing in and out," and that the only way he could see into defendant's office was by going out into the hall. Yet the defendant himself testifies that he was in his office up to ten A. M., that the train left Bloomingburg about four P. M., and states that he must have been in his office on that day " by half-past four or a quarter to five, anyway, in the afternoon " for the balance of the day. The prosecutor was not asked the time of the occurrence of January twenty-seventh. Thus, even if defendant's story of the alibi was credited, he, according to his own story, was in his office up to ten A. M. and after four-thirty P. M. or four-forty-five P. M. for " the balance of the day."

Under the plea of inpotency the defendant testified that he was born in 1854, had been impotent since March, 1916; that his vital powers began to decline rapidly when he was fifty-seven years old, and continued in this course until an illness in

June and July, 1915; that an illness that came in March, 1916, left him entirely impotent; that some one sent him circulars, whereupon he wrote to different houses and to a doctor (naming him) of Fort Wayne, Ind., recommended as a specialist on impotency, who gave him a treatment. He attempted to introduce a letter from that physician. Defendant testified that he had no vital power, no "erection power." On cross-examination he testified that when his wife who afterwards divorced him was "dissatisfied," a doctor (naming him) of Newark, N. J., who examined *her*, told her that the fault was not hers; that he had not been examined since that time; that his own physician, Dr. Douglass of Middletown, never treated him for impotence and that he had never called that physician's attention to it — that up to 1916 he was "at least partially potent," and that the district attorney might have his own interpretation to the question, that he had some erective power but not as he would like. He testifies that he had no power "except in the morning." The witness did not "propose" to answer the question whether he had ever tried to perform the sexual act, and stated that his knowledge of non-erective power came from the fact that he had no erections in the afternoon or night that came of themselves, that he never had treatment from any reputable physician in his county, as he wished to conceal his weakness, but that he himself endeavored to correct it as he desired full manhood, as would any man. His testimony at least indicates an earnest desire on the part of an unmarried man of advanced years, not for restoration, but invigoration.

If the defendant had been innocent of sexual relations with the girl, it would seem natural that after the birth of her child the defendant, who had bestowed upon her almost the attentions of a parent, who had been for years in supervision of her daily living, who had made her the beneficiary of his will, who had been the intimate friend and trusted adviser of her parents, would have shown sorrow over her plight, or, being also a

lawyer, might have offered advise or have shown some interest or activity in hunting down the wrongdoer. So far as the record shows, he did nothing, he said nothing. Even his own testimony is bare of a statement made at any time, of sorrow or sympathy for the girl or her parents, much less of counsel or advice. It could be asked whether the mere misfortune of this girl could have changed the ardent affection of this old man, if innocent of any improper relations with the girl, into apparent absolute indifference. Such constant aloofness can hardly be explained as that of an innocent man unjustly accused. If any one had suggested he was the father of the child, the evidence is that the girl herself had declared at first he was not, and did not accuse him until some weeks after the birth of her child. As BARTLETT, J., says for the court in People v. Poulin (207 N. Y. 78): "The case resolved itself into a question of credibility, and there is nothing in the record to indicate that the jury passed upon that question incorrectly. The fact that a jury in a criminal case has chosen to believe one set of witnesses rather than another set, upon an issue where the conflict between them is irreconcilable, affords no ground in and of itself for interfering with the verdict. (See People v. Ferrara, 199 N. Y. 414, 25 N. Y. Crim. 121.) To justify a reversal on the facts under such circumstances, the appellate court must be able to detect some reason why the version which has been adopted by the jury should have been rejected. We can find no such reason here."

I advise that the judgment of conviction of the County Court of Orange county be affirmed.

MILLS, RICH, PUTNAM and KELLY, JJ., concurred.

Judgment of conviction of the County Court of Orange county affirmed.