87 N.J. Super. 442 (1965)
209 A.2d 668
ARTHUR McCARTHY, PLAINTIFF,
v.
NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, INC., OLD BRIDGE STADIUM, INC. AND WALTER LAWSON, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided April 29, 1965.
*444 Mr. Alfred S. Julien and Mr. Herman B. Glaser, attorneys for plaintiff (Mr. M. Marvin Soperstein, of counsel).
Messrs. DeSevo & Cerutti (Mr. Edward DeSevo appearing), attorneys for defendant National Association for Stock Car Auto Racing, Inc.
Messrs. Lynch, Murphy, Mannion & Lynch (Mr. John Lynch, appearing), attorneys for defendants Old Bridge Stadium, Inc. and Walter Lawson.
MARTINO, J.S.C.
The plaintiff on June 4, 1961 entered a stock car race promoted by the National Association for Stock Car Auto Racing, Inc. (NASCAR) and Old Bridge Stadium, Inc. The car was so constructed that a neoprene (synthetic rubber) hose was attached to the gas tank and passed through the vehicle and then through a forward fire wall where it connected with the fuel pump. The plaintiff had never before entered an automobile in a race held in the stadium operated by the defendant, Old Bridge Stadium. On the day of the race he drove his stock car up to the entrance where he advised *445 a man in attendance that he was interested in entering a race and upon being asked if he belonged to the National Association for Stock Car Auto Racing, Inc. (NASCAR) and responding in the negative, he was advised that he had to join NASCAR. He paid a fee of $15 and was given a form which he described as a questionnaire. He was requested to sign it and after signing and paying the requested fee he was told that he was then a member of NASCAR and was permitted to drive into the racing area. The man who sought his signatures was described as an official of defendant sponsors. No mention was ever made of a release; he does not remember signing any releases. No one inspected or tested his vehicle before he was permitted to enter the racing area. He entered a race, the distance of which was eight or ten laps, and when the final flag dropped and he had won the race, the vehicle burst into flames and he was severely burned. He testified he saw "flames shooting in the car all around this gas line that was on the floor. * * *, and there was an explosion. * * * Gasoline caused it." He admits receiving $40 per week from NASCAR and medical and hospital expenses while disabled which he attributed to benefits from insurance for which he paid a fee when he entered the race. He did not offer to have his car inspected or tested. He was not acquainted with any NASCAR rules or regulations. He states that no discussion was had with anyone at the track with reference to inspection or testing of his vehicle prior to entering the race. He had never entered a stock car race sponsored by NASCAR.
Two releases have been admitted without objection. Both were executed by the plaintiff. One form of release was signed by each of the contestants who desired to enter races and the name of the plaintiff appears thereon as a contestant. This release exempts from liability for injuries or death the defendant NASCAR and the defendant licensed promoter and its agents, officers, servants and employees. The other release is headed "Benefit Plan Registration" and designated thereon are the date and place of birth of the plaintiff, his occupation *446 and employer and the names of his wife and children and a designation thereon of his wife as his death beneficiary. This document states that, upon the issuance of a NASCAR license to the plaintiff and upon payment of fees required by NASCAR, the plaintiff and his executors, administrators and heirs would only be entitled to the benefits provided by a benefit plan promulgated by NASCAR for accidental injuries including death. The benefits authorized by said plan are set forth therein and the form concludes with wordage that amounts to a release of NASCAR and the promoters and owners and lessees of the premises and others for any injuries or death.
Negligence or contributory negligence of the parties is not an issue for decision at this time. The question for determination is whether the defendants as releasees have validly immunized themselves against liability for an alleged act of negligence committed after the execution of general releases. The defendants, by their respective answers, raise the defense of releases. The plaintiff failed to file a reply to avoid the effect of these releases, nor has he sought to do so. R.R. 4:8-3, R.R. 4:7-1, R.R. 4:15-1. The status of the pleadings amounts to a denial of the releases. R.R. 4:8-4. In this posture of the pleadings the existence of a valid release would terminate the plaintiff's cause of action.
Races of the type in which the plaintiff was engaged which are sponsored and promoted by the defendants are regulated by statute. N.J.S.A. 5:7-8 et seq.
N.J.S.A. 5:7-14 provides:
"The department shall formulate and prescribe rules and regulations * * *. Said rules and regulations shall prescribe the types or character of protective devices designed to protect participants in * * * any such race or exhibition, including, but not limited to, the matters of track construction and condition, guard rails, pit facilities, lighting, inspection of vehicles and equipment * * * fire protection * * * and generally governing the conduct of all motor vehicle races and exhibitions of motor vehicle driving skill to be held within this State and governs the issuance of licenses therefor." (Emphasis added)
*447 N.J.S.A. 5:7-18 provides:
"Any person, partnership, association or corporation managing, operating, or conducting a motor vehicle race or exhibition of motor vehicle driving skill * * * violating any of the provisions of this act shall be a disorderly person, and upon conviction shall be punished for each such offense, by a fine of not less than two hundred dollars ($200.00) and not more than one thousand dollars ($1,000.00) or by imprisonment for not more than one year, or by both such fine and imprisonment."
Pursuant to N.J.S.A. 5:7-14, the Department of Law and Public Safety promulgated rules, and Rule 7, sec. III, provides:
"All vehicles participating in races shall have suitable metal flooring and a metal fire wall between the fuel supply and the driver and between the engine and the driver. No fuel lines or fuel pumps will be permitted in the driver's compartment unless properly shielded by metal. * * *" (Emphasis added)
Rule 10, sec. III, provides:
"A representative of the track licensee will be required to test and approve each race car for brake pedal reserve before the car leaves the pit area to enter the track.
No vehicle shall be permitted to participate in any race or exhibition if the braking system includes the direct application of pressure to any of the tires."
The defendants argue that no rule of the Department requires them to inspect the motor vehicles of participants. A close reading of the rules would imply that an inspection is required by the licensees (defendants) in order to determine that the rules are being complied with. Surely a test required by Rule 10 referred to above would indicate that an inspection is at least inferred. Parenthetically, it may be stated that rules of NASCAR with which plaintiff was unacquainted, among other things, provide that gas lines must run under bottom of the body. Sec. 21E, par. 11(f), p. 56; sec. 21, par. 21(f), p. 35; sec. 21C, par. 9(b), p. 46; sec. 21D, par. 9(b), p. 51.
Statutes have been passed from time to time establishing certain standards of conduct to prevent damages and consequent *448 injury. In Evers v. Davis, 86 N.J.L. 196 (E. & A. 1914), the court said:
"Upon common-law principles, therefore, when the legislature has by public statute established a certain standard of conduct in order to prevent a danger that it foresaw, it has in this regard forewarned the `ordinary prudent man' and through him the defendant in a civil action, whose conduct must always coincide with this common-law criterion. * * *" (at p. 204)
A legislative enactment may expressly require or prohibit a particular act for the protection of the individual interests of the members of the public. If so, the omission or doing of the act if it invades an interest intended to be protected creates liability although the statute does not expressly so provide and although the statute imposes a punishment or penalty payable to the State or municipality. Restatement, Torts (Negligence) (1934) sec. 287(a).
When the Legislature has, by statute, established a certain standard of conduct, one of the class for whose protection the statute was enacted obtains the benefit of the statute in an action for negligence if the breach was the efficient cause of the injury of which he complains. Daniels v. Brunton, 9 N.J. Super. 294 (App. Div. 1950), affirmed 7 N.J. 102 (1951); Evers v. Davis, supra.
The duties and rights of parties to an ordinary contract are created by and arise solely from the contract itself. The State has no interest in it. On the other hand the State, because of its interest in the welfare of its citizens, regulates and supervises the type of venture in which these defendants participated. Of course, private parties to a transaction lacking public interest are bound by their agreements relieving against liability for negligence. Globe Home Improvement Co. v. Perth Amboy, etc., Inc., 116 N.J.L. 168 (E. & A. 1936); Kuzmiak v. Brookchester, 33 N.J. Super. 575 (App. Div. 1955).
An immunity clause is undoubtedly valid and enforceable if it does not contravene any policy of the law, i.e., *449 if it is not a matter of interest to the public or the State but merely an agreement between persons relating entirely to their private affairs. The situation becomes entirely different in the eyes of the law when the legislation in question is, as here, legislation obviously intended for the protection of human life. In such event public policy does not permit an individual to waive the protection which the statute is designed to afford him. Boyd v. Smith, 372 Pa. 306, 94 A.2d 44 (Sup. Ct. 1953).
While freedom of contract should permit exculpatory provisions in a contract to exempt a party from its own negligence, most courts have clearly indicated that one cannot exempt himself from negligence in cases of a positive duty imposed by law. Cerny, Pickas & Co. v. C.R. Jahn Co., 347 Ill. App. 379, 106 N.E.2d 828 (App. Ct. 1952).
Contracts exempting liability for negligence are frequently invalidated because of the principle that parties cannot stipulate for protection against liability for negligence in the performance of a legal duty, or where a public interest is involved or a public duty owed. 17 C.J.S. Contracts § 262, p. 1164.
The philosophy which justifies the avoidance of exculpatory agreements in a case of this type finds its expression in a suit not analogous in facts but indicative of the reason why the law should follow this path. In Johnston v. Fargo, 184 N.Y. 379, 77 N.E. 388, 7 L.R.A., N.S., 537 (Ct. App. 1906), the court said:
"To a certain extent, the internal activities of organized society are subject to the restraining action of the state. This is evidenced by the many laws upon the statute book, in recent years, which have been passed for the purpose of prohibiting, restricting, or regulating the conduct of a private business, either because regarded as hurtful to the health or welfare of the community, or because deemed from its nature or magnitude affected with a public interest. It has been observed that it is still business of the state, in modern times, to defend individuals against one another, and, though the proposition is a broad one, when considered with reference to penal legislation, and all legislation intended for the promotion of the health, welfare, and safety of the community, it is not without truth."
*450 Another question arises from an exploration of the text of the executed releases. The provisions of the releases upon which the defendants rely do not specifically exonerate them for "negligence." One release merely states, in substance, "A driver * * * in any race held at these premises releases NASCAR, the licensed promoter and its agents, officers, servants and employees of and from any and all liability, claims, demands, actions and causes of action whatsoever arising out of or related to any * * * injury * * * that may be sustained by * * * each of the undersigned."
The other release states, in substance, "I do hereby release, remise and forever discharge NASCAR and the promoters presenting races or other events under NASCAR sanction and the owners and lessees of premises on which NASCAR sanctioned events are presented * * * from all liability claims, actions and possible causes of action whatsoever that may accrue to me * * *."
Contracts of this nature are not favored by the law. They are strictly construed against the party relying on them and clear and explicit language in the contract is required to absolve a person from such a liability. 17 C.J.S. Contracts § 262, pp. 1160, 1161.
In Freddi-Gail, Inc. v. Royal Holding Corp., 34 N.J. Super. 142 (App. Div. 1955), the court said:
"According to the weight of authority at the common law, an exculpatory clause exempting a landlord from liability * * * without clearly adverting to the matter of negligence on the landlord's part, does not absolve him from his own negligence, at least from negligence of an affirmative sort." (at p. 143; emphasis added)
In Kaufman v. American Youth Hostels, Inc., 13 Misc.2d 8, 174 N.Y.S.2d 580 (Sup. Ct. 1957), affirmed 5 N.Y.2d 1016, 185 N.Y.S.2d 268, 158 N.E.2d 128 (Ct. App. 1959), the court held that a release which did not state in precise words that the plaintiff exempted the defendant from liability for personal injuries caused by defendant's negligence does not exculpate defendant from the alleged negligence and *451 such a defense of release was stricken because of legal insufficiency.
For these reasons it would appear that the defense of release would be ineffective to bar the plaintiff's cause of action.
It is, therefore, determined that the releases executed by plaintiff are invalid as a complete bar to plaintiff's right to sue.