793 A.2d 125 (2002)
349 N.J. Super. 205
Joseph DARE and Patricia Dare, his wife, Plaintiffs-Appellants,
v.
FREEFALL ADVENTURES, INC., John Eddowes, Warren Acron and Eric Keith Johnson, Defendants-Respondents.
Joseph Dare and Patricia Dare, his wife, Plaintiffs-Respondents,
v.
Freefall Adventures, Inc., and John Eddowes, Defendants-Appellants,
Warren Acorn and Eric Keith Johnson, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued February 4, 2002.
Decided March 21, 2002.
*127 Stephen Cristal, Hainesport, argued the cause for Joseph and Patricia Dare, appellants in A-2629-00T1 and respondents in A-2789-00T1 (Mark J. Molz, attorney; Mr. Cristal, on the brief).
Kelly Johnson, argued the cause for Freefall Adventures, Inc. and John Eddowes, respondents in A-2629-00T1 and appellants in A-2789-00T1 (Ms. Johnson, on the brief).
Vincent J. Pancari, Vineland, argued the cause for respondent Eric K. Johnson in A-2629-00T1 (Kavesh, Pancari, Tedesco & Pancari, attorneys; Robert Pancari, on the brief).
Before Judges HAVEY, COBURN and WEISSBARD.
*126 The opinion of the court was delivered by *128 HAVEY, P.J.A.D.
Plaintiff Joseph Dare was injured in a skydiving accident when he attempted to avoid colliding with defendant Eric Keith Johnson, a co-participant in the jump.[1] Prior to the jump, plaintiff signed a release/waiver agreement with the operator of the skydiving facility, defendant Freefall Adventures, Inc. (Freefall), under which plaintiff released Freefall from any claims for injuries arising from Freefall's negligence. The agreement further provided that, in the event plaintiff instituted a suit against Freefall, plaintiff agreed to pay Freefall's counsel fees incurred in defending the suit. The trial court granted summary judgment in favor of all defendants dismissing plaintiffs' personal injury action. The court concluded that plaintiffs failed to establish a prima facie case of negligence.[2] It also dismissed Freefall's counterclaim in which it demanded counsel fees in accordance with the release/waiver agreement, as well as the Frivolous Claims Statute, N.J.S.A. 2A:15-59.1, and Rule 1:4-8.
We conclude that the recklessness standard applied to Johnson and the ordinary negligence standard applied to Freefall, and, based on the evidentiary material submitted, see Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 666 A.2d 146 (1995), summary judgment was properly granted to all defendants. We further hold that the fee-shifting provision under the release/waiver agreement signed by plaintiff is void as against public policy, and that Freefall is not entitled to counsel fees under the Frivolous Claims Statute. We therefore affirm dismissal of Freefall's counterclaim.
Considering the evidentiary material in a light most favorable to plaintiffs, id. at 523, 666 A.2d 146, these are the facts. On July 9, 1995, plaintiff Joseph Dare, a licensed and experienced skydiver, having jumped on 137 prior occasions, utilized the skydiving facilities operated by Freefall[3] in Williamstown, Gloucester County. Plaintiff had been using the Freefall facility for over two years and nearly every week for the six months preceding his accident.
Prior to his jump on July 9, 1995, plaintiff executed a five-page "Waiver of Rights, Release and Indemnity Agreement" which defined the risks of injury or death associated with skydiving. Page 3 of the waiver provided:
1. I hereby RELEASE AND DISCHARGE... FREEFALL ... from any and all liability, claims, demands or causes of action that I may hereinafter have for injuries and damages arising out of my participation in parachuting activities.
2. I further agree that I WILL NOT SUE OR MAKE CLAIM against [Freefall] for damages or other losses sustained as a result of my participation in parachuting activities.... I also agree to INDEMNIFY AND HOLD [Freefall] HARMLESS from all claims, judgments and costs, including attorneys' fees, incurred in connection with any action brought as a result of my participation in parachuting activities....
Page 4 provided:
2. EXEMPTION FROM LIABILITY. [Plaintiff] ... releases [Freefall] *129 ... from any and all liability ... arising out of any ... injury to [plaintiff] ... while participating in any of the activities contemplated by this AGREEMENT ... whether such ... injury results from the negligence of [Freefall] ....
3. COVENANT NOT TO SUE. [Plaintiff] agrees never to institute any suit or action at law or otherwise against [Freefall], its owners, officers, agents, employees, servants, or lessors ... by reason of injury to [plaintiff] ... arising from the activities contemplated by this AGREEMENT....
[Emphasis added.]
A second "Agreement and Release," signed by plaintiff, in favor of Cross Keys Airport, Inc. and Freefall stated:
5. REIMBURSEMENT FOR LEGAL FEES AND EXPENSES. The [plaintiff] expressly agrees and covenants to fully reimburse [Freefall] for all legal costs and reasonable counsel fees... paid by [Freefall], for the ... defense of any and all actions or cause of action or claim or demand for damages whatsoever, which may hereafter arise or be instituted or recovered against [Freefall], by the [plaintiff] ... regardless of any negligence on the part of [Freefall] ....

[Emphasis added.]
On the day of the jump, plaintiff was accompanied by defendant Eric Johnson, another licensed and experienced skydiver, in the airplane transporting the divers to the drop zone. Johnson jumped first, followed by plaintiff. Plaintiff claims that he was injured because he was required to make an emergency turn during his descent in order to avoid colliding with Johnson. In his certification, plaintiff states:
Defendant Johnson [was] skydiving in a reckless manner; he was far outside the [landing] pattern, he was too low to the ground over the airplane runway. It was reckless of him to be that close to the runway at that altitude. It is one of the most basic rules of skydiving that you cannot land on or near a runway. Defendant Johnson was essentially being a "hot-dog," which is inappropriate.
Because Defendant Johnson was so far outside the [landing] pattern, he had to recklessly cut across wind back toward the drop zone, and in doing so was heading right into [plaintiff's] path of travel. Had [plaintiff] not maneuvered, [they] would have collided. In trying to avoid the collision, [plaintiff] maneuvered quickly, which caused [plaintiff] to fall down to the ground.
In his deposition plaintiff stated that during his descent the closest he came to Johnson was between 150 and 175 feet. He further acknowledged that since Johnson jumped first, Johnson had the right of way.[4] Plaintiff also admitted that prior to the jump he had arranged with his wife to have her photograph him during his jump. According to defendants, this plan required plaintiff to steer his flight toward a concession trailer operated by his wife, which was surrounded by buildings and other dangerous obstacles. Defendants argue that plaintiff's sudden diversion from this path was necessary to avoid striking the buildings near his wife's trailer.
*130 The New Jersey Department of Transportation regulates parachuting centers in order "to foster, control, supervise and regulate sport parachuting...." N.J.A.C. 16:58-1.2. The pertinent rules require participants to meet various training and licensing standards before parachuting, and define the manner and place where a jumper should exit the aircraft. However, the regulations do not impose any express duties upon the operator of the skydiving facility or define the standard controlling a skydiver's conduct during his descent. See N.J.A.C. 16:58-1.1 to -3.1. Also, the Federal Aviation Administration (FAA) has appointed the United States Parachuting Association (USPA) to oversee the sport of parachuting. The USPA promulgates rules which: (1) require licensing; (2) prohibit jumps into hazardous areas and the use of alcoholic beverages and drugs; and (3) establish standards regarding canopy control, maneuvering and landing. See Skydiver's Information Manual, supra, at § 4.06C(1); § 4.19; § 4.20D and § 4.23. Otherwise, skydiving is a self-regulated industry.

I
In granting summary judgment in favor of Johnson, the trial court concluded that even under the negligence, rather than the recklessness, standard, see Crawn v. Campo, 136 N.J. 494, 643 A.2d 600 (1994), plaintiffs had failed to demonstrate a prima facie case. The court stated:
The facts basically are that this defendant, Johnson, exited the airplane prior to [plaintiff] exiting the airplane. At the time ... just before the accident, the plaintiff indicates that the closest he got to Mr. Johnson was between 150 and 175 feet which is half a football field away. Everyone concedes that the person lowestclosest to the ground has the right-of-way. Clearly, [plaintiff] was altering his drop pattern to some extent. His observation was that he thought Johnson was closer to the runway than he should have been, but that does not appear to me to be any proximate cause at all.
I frankly don't see how reasonable men could differ on this even giving all of the necessary inferences to the plaintiff for this particular motion. I think I am compelled to grant the summary judgment in favor of this defendant. Given the fact that there is no expert to give us any guidance with respect to any other standard of care, even applying a basic standard of care in a negligence matter, I just can't see how [Johnson] could have contributed to this accident at all.
We are satisfied that plaintiffs had the burden of proving that Johnson's conduct was reckless, rather than negligent. In Crawn, a case involving an injury during an informal softball game, the Court held that "the duty of care applicable to participants in informal recreational sports is to avoid the infliction of injury caused by reckless or intentional conduct." Id. at 497, 643 A.2d 600. The Court's determination was grounded on two policy considerations; the promotion of vigorous participation in athletic activities, and the avoidance of a flood of litigation generated by voluntary participation in games and sports. Id. at 501, 643 A.2d 600. The Court added:
Our conclusion that a recklessness standard is the appropriate one to apply in the sports context is founded on more than a concern for a court's ability to discern adequately what constitutes reasonable conduct under the highly varied circumstances of informal sports activity. The heightened standard will more likely result in affixing liability for conduct that is clearly unreasonable and *131 unacceptable from the perspective of those engaged in the sport yet leaving free from the supervision of the law the risk-laden conduct that is inherent in sports and more often than not assumed to be "part of the game."
[Id. at 508, 643 A.2d 600 (emphasis added).]
Since Crawn, the recklessness standard of care has been applied to other informal sports activities. See, e.g., Obert v. Baratta, 321 N.J.Super. 356, 729 A.2d 50 (App.Div.1999) (applying recklessness standard when softball player sued teammate for injuries sustained as a result of teammate's pursuit of fly ball during informal intra-office game); Calhanas v. South Amboy Roller Rink, 292 N.J.Super. 513, 679 A.2d 185 (App.Div.1996) (applying recklessness standard where roller skater suffered broken leg from collision with another skater). In Schick v. Ferolito, 167 N.J. 7, 767 A.2d 962 (2001), where a golfer was struck by an errant tee-shot, the Court expanded the Crawn holding to "all recreational sports," whether perceived as "contact" or "noncontact" activities. Id. at 18, 767 A.2d 962. The Court observed that:
The applicability of the heightened standard of care for causes of action for personal injuries occurring in recreational sports should not depend on which sport is involved and whether it is commonly perceived as a "contact" or "noncontact" sport. The recklessness or intentional conduct standard of care articulated in Crawn was not meant to be applied in a crabbed fashion. That standard represented the enunciation of a more modern approach to our common law in actions for personal injuries that generally occur during recreational sporting activities.
[Id. at 18-19, 767 A.2d 962]
Skydiving is a popular, "risk-laden" recreational sport. Crawn, supra, 136 N.J. at 508, 643 A.2d 600. Therefore, there is no basis in fact or law to conclude that the recklessness standard under Crawn is inapplicable. Moreover, Crawn's policy underpinnings clearly apply. As in recreational softball games or golf, it would hardly promote "vigorous participation" in the activity if skydivers were exposed to lawsuits when their mere negligence during descent caused an injury to a co-participant. Further, application of the simple negligence standard may invite a floodgate of litigation generated by voluntary participation in the activity. Id. at 501, 643 A.2d 600.
Even considering plaintiffs' proofs most indulgently, we conclude that plaintiffs fail to meet the recklessness standard. Reckless behavior entails highly unreasonable conduct, involving "an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." Schick, supra, 167 N.J. at 19, 767 A.2d 962 (citing Prosser & Keeton on Torts § 34, at 214 (5th Ed.1984)). "The standard is objective and may be proven by showing that a defendant `proceeded in disregard of a high and excessive degree of danger either known to him [or her] or apparent to a reasonable person in his [or her] position.'" Ibid. "Recklessness, unlike negligence, requires a conscious choice of a course of action, with knowledge or a reason to know that it will create serious danger to others." Schick, supra, 167 N.J. at 20, 767 A.2d 962.
It is undisputed that Johnson, who jumped first, had the right-of-way during the descent and, according to skydiving standards, plaintiff had a duty to yield if, as plaintiff claims, Johnson altered his course. In addition, plaintiff was never closer than 150 to 175 feet to Johnson during the descent. Plaintiffs fail to demonstrate how, considering such a distance, Johnson "`proceeded in disregard of a *132 high and excessive degree of danger'" to plaintiff. Id. at 19, 767 A.2d 962.
Moreover, unlike the applicable standard of care governing an informal softball game, where expert testimony is not required, Crawn, supra, 136 N.J. at 508-09, 643 A.2d 600, skydiving requires the training and licensing of participants. According to the record, it involves knowledge and conduct peculiar to the activity, including an understanding of wind direction and velocity, proper diver spacing, control of descent, and avoidance of ground hazards. The trial court correctly determined that because of the complexities and variables involved in applying pertinent skydiving guidelines, expert testimony was necessary to establish what standard of care applied to Johnson, and how he deviated from that standard. See Butler v. Acme Markets, Inc., 89 N.J. 270, 283, 445 A.2d 1141 (1982) (expert testimony is necessary when the subject matter "is so esoteric that jurors ... cannot form a valid judgment as to whether the conduct of the party was reasonable"); see also Giantonnio v. Taccard, 291 N.J.Super. 31, 43-44, 676 A.2d 1110 (App.Div.1996) (holding that expert testimony was required to establish the standard of care in the safe conduct of a funeral procession). Plaintiffs presented no such expert testimony, despite the opportunity to do so. In the circumstances, summary judgment was properly granted in favor of Johnson.

II
Plaintiffs next argue that the trial court erred in granting summary judgment to Freefall, contending that fact issues exist as to whether Freefall maintained and operated a reasonably safe skydiving facility. Freefall contends that Crawn's recklessness standard applies.
Plaintiffs submitted certifications stating that Freefall: (1) exercised no control over the "reckless" behavior of skydivers using the facility; (2) permitted the consumption of drugs and alcohol by skydivers; (3) did not conform to applicable skydiving standards of care; and (4) established a drop zone that was not in conformance with industry standards.
We first reject Freefall's argument that the recklessness standard applies. The Crawn/Schick recklessness standard was imposed in the context of claims arising out of injuries caused by a co-participant in the sports activity. Here, the question is what duty of care is owed by the operator of a facility where the injury occurred. Since Crawn, we have addressed this distinction.
For example, in Underwood v. Atlantic City Racing Ass'n, 295 N.J.Super. 335, 685 A.2d 40 (App.Div.1996), certif. denied, 149 N.J. 140, 693 A.2d 110 (1997), we held that the Crawn standard did not apply where a jockey was injured during a race because plaintiff's theory was that the accident occurred as a result of the negligent installation of lighting by the racetrack, a condition that was not "inherent in sports and ... not assumed to be `part of the game.'" Id. at 343, 685 A.2d 40 (quoting Crawn, supra, 136 N.J. at 508, 643 A.2d 600).
Similarly, in Rosania v. Carmona, 308 N.J.Super. 365, 367, 706 A.2d 191 (App.Div.), certif. denied, 154 N.J. 609, 713 A.2d 500 (1998), we concluded that the recklessness standard did not apply where a karate (dojo) student was injured by an instructor, holding that:
in this commercial setting, the jury should have been charged that defendants owed a duty to patrons of the dojo not to increase the risks inherent in the sport of karate under the rules a reasonable student would have expected to be in effect at that dojo .... the jury *133 should have been charged that the correct scope of duty owed by the expert instructor and the academy was one of due care ....
[Id. at 368, 706 A.2d 191 (emphasis added).]
Thus, the question for the jury was whether the risks inherent in the karate match between plaintiff and his instructor "were materially increased beyond those reasonably anticipated," applying "the ordinary duty owed to business invitees...." Id. at 374, 706 A.2d 191.
Finally, in Schneider v. Am. Hockey & Ice Skating Ctr., Inc., 342 N.J.Super. 527, 777 A.2d 380 (App.Div.), certif. denied, 170 N.J. 387, 788 A.2d 772 (2001), we held that the owner of a sports facility owed a "limited" duty to protect spectators from flying hockey pucks by providing secure seats for those spectators who request them, and also to screen any seats "that pose an unduly high risk of injury...." Id. at 534, 777 A.2d 380. We concluded that imposition of this limited duty was "indirectly" supported by Crawn's observation that "`the risk of injury is a common and inherent aspect of informal sports activity'" and "`participants ... assume the ordinary risks of those activities.'" Id. at 535, 777 A.2d 380 (quoting Crawn, supra, 136 N.J. at 500-01, 643 A.2d 600). We added:

Although the operator of a sports facility is subject to a standard of care based on negligence rather than the recklessness standard applicable to participants in recreational sporting activities, McLaughlin [v. Rova Farms, Inc.], supra, 56 N.J. [288] at 303-04, 266 A.2d 284, it is appropriate in defining a sports facility operator's duty of care to consider that any spectators choose to "assume the ordinary risks" of being struck by a flying ball or puck in order to obtain an unobstructed view of the playing field and that these are "common and inherent" risks of attending a baseball or hockey game. Crawn, supra, 136 N.J. at 500-01, 643 A.2d 600.
[Schneider, supra, 342 N.J.Super. at 535, 777 A.2d 380 (emphasis added).]
Consequently, the question here was whether, under the ordinary duty owed to business invitees, considering the nature of the risks associated with skydiving and the foreseeability of injury, Kuzmicz v. Ivy Hill Park Apartments, Inc., 147 N.J. 510, 515, 688 A.2d 1018 (1997), plaintiff's risk of injury was materially increased beyond those reasonably anticipated by skydiving participants as a result of the manner by which Freefall operated its facility. Rosania, supra, 308 N.J.Super. at 374, 706 A.2d 191. Plaintiffs failed to demonstrate such a material increase in risk.
There was absolutely no evidence presented that Freefall failed to supervise the divers on the day of plaintiff's accident. The record established that the loading of the aircraft, its operation, and the jumps themselves, were uneventful. Nothing suggests that Freefall personnel knew or should have known that plaintiff, or any other diver, was in peril because of the conduct of other participants. Moreover, Freefall had no way of controlling plaintiff's, Johnson's, or any other jumper's maneuvering of their parachute canopies during the descent. Both plaintiff and Johnson were trained and licensed skydivers. It is undisputed that once airborne, it was their duty alone to proceed with due care.
Further, no competent proof of drug abuse was presented; plaintiff conceded that he knew of no incident of drug use on the day in question. Also, John Eddowes, owner of Freefall, testified that his facility adhered to the industry's "eight hour rule," prohibiting consumption of alcohol within eight hours of a jump. Johnson *134 testified that he complied with this rule, and there was no other evidence presented that Freefall personnel knew or should have known that Johnson or other jumpers had not complied with it. Although plaintiff stated that he smelled alcohol while on the aircraft, he was unable to say from whom the odor emanated. Moreover, there was no showing of how, even if alcohol had been consumed, that fact contributed to plaintiff's accident. Tellingly, plaintiff opted to jump notwithstanding his alleged awareness of alcohol consumption.
Finally, plaintiffs claimed that Freefall's drop zone was not in accordance with regulatory minimum size requirements. But no evidence, expert or otherwise, was presented to establish: (1) how, and to what degree, Freefall's drop zone was not in compliance with industry standards; and (2) if the drop zone was substandard, how this deficiency was a proximate cause of plaintiff's injury. Indeed, it is undisputed that Freefall's facility was licensed and inspected by the Department of Transportation, and the facility was never cited for the size or condition of the drop zone. We conclude that summary judgment was properly granted in Freefall's favor.

III
In its separate appeal, Freefall argues that the trial court erred in dismissing its counterclaim demanding counsel fees due it under the release/waiver signed by plaintiff. Alternatively, Freefall claims that counsel fees should have been awarded to it pursuant to the Frivolous Claims Statute, N.J.S.A. 2A:15-59.1, and the court rule governing frivolous actions. R. 1:4-8.
As noted, prior to his jump plaintiff signed an agreement releasing Freefall from any liability in the event plaintiff is injured, even if the injury was a result of Freefall's own negligence. Moreover, the agreement had a fee-shifting provision, requiring plaintiff to pay Freefall's counsel fees in the event plaintiff instituted suit seeking damages. The trial court found it unnecessary to address the enforceability of the release/waiver agreement, since, as it observed during Freefall's motion for reconsideration, the sole "issue was whether or not [plaintiffs'] claim was frivolous." In concluding that Freefall failed to make a viable claim under the Frivolous Claims Statute, the court underscored New Jersey's public policy "to afford litigants an opportunity to have access to the courts."
In New Jersey, disclaimers or limitations of liability are not favored. Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 373, 161 A.2d 69 (1960). Nevertheless, courts in other jurisdictions have upheld exculpatory contracts signed by participants in skydiving or parachuting. See e.g., Allan v. Snow Summit, Inc., 51 Cal.App. 4th 1358, 59 Cal.Rptr.2d 813 (Cal.App.1996); Paralift, Inc. v. Superior Court, 23 Cal.App.4th 748, 29 Cal.Rptr.2d 177 (Cal.App.1993); Hulsey v. Elsinore Parachute Ctr., 168 Cal.App. 3d 333, 214 Cal.Rptr. 194 (Cal.App.1985); Heil Valley Ranch, Inc. v. Simkin, 784 P.2d 781 (Colo.1989); Jones v. Dressel, 623 P.2d 370 (Colo.1981). Other cases hold that such releases are void as to a claim of gross negligence or willful or wanton conduct. See e.g., In re Pacific Adventures, Inc., 27 F.Supp.2d 1223 (D.Haw.1998); Wheelock v. Sport Kites, Inc., 839 F.Supp. 730 (D.Haw.1993); Falkner v. Hinckley Parachute Ctr., Inc., 178 Ill.App.3d 597, 127 Ill.Dec. 859, 533 N.E.2d 941 (1989).
Although New Jersey courts have not addressed release/waiver agreements in the context of skydiving, we have considered the effect of such agreements in other sporting activities. For example, we have observed that a release from liability for injuries arising from ski injuries in an application to become a member of a condominium *135 association, may be void as against public policy because of its adhesive nature, and further because the release cannot relieve the owner of the ski resort from its statutory duty of care under N.J.S.A. 5:13-3a. Brough v. Hidden Valley, Inc., 312 N.J.Super. 139, 155, 711 A.2d 382 (App.Div.1998). But see McBride v. Minstar Inc., 283 N.J.Super. 471, 486, 662 A.2d 592 (Law Div.1994), aff'd 283 N.J.Super. 422, 662 A.2d 567 (App.Div.), certif. denied, 143 N.J. 319, 670 A.2d 1061 (1995) (upholding an exculpatory clause as part of an agreement to purchase ski equipment, because, in part, the release does not undermine a statutory duty of care or contravene public policy).
In McCarthy v. Nat. Ass'n for Stock Car Auto Racing, Inc., 87 N.J.Super. 442, 449-50, 209 A.2d 668 (Law Div.1965), aff'd, 90 N.J.Super. 574, 218 A.2d 871 (App.Div.), certif. granted, 47 N.J. 421, 221 A.2d 221 (1966), aff'd, 48 N.J. 539, 226 A.2d 713 (1967), the Law Division determined that a release in NASCAR's favor was void because NASCAR's obligation to inspect plaintiff's vehicle was a "positive duty" imposed by New Jersey's statutory law. See also Chemical Bank of New Jersey Nat. Ass'n v. Bailey, 296 N.J.Super. 515, 527, 687 A.2d 316 (App.Div.), certif. denied, 150 N.J. 28, 695 A.2d 671 (1997) (holding that while an exculpatory clause in a private contract may limit liability, courts will not enforce such a clause "if the party benefitting from exculpation is subject to a positive duty imposed by law or ... if exculpation of the party would adversely affect the public interest").
In this case, we need not decide whether, under the agreement signed by plaintiff, he waived his right to sue Freefall, since we have affirmed the summary judgment dismissing plaintiffs' suit on substantive grounds. However, we must determine whether the contractual fee-shifting provision under the agreement is enforceable.
"New Jersey has a strong policy disfavoring shifting of attorneys' fees." North Bergen Rex Transp., Inc. v. Trailer Leasing Co., 158 N.J. 561, 569, 730 A.2d 843 (1999). We adhere to the "American rule" that "`the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser.'" Rendine v. Pantzer, 141 N.J. 292, 322, 661 A.2d 1202 (1995) (quoting Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141, 147 (1975)). Thus, our Supreme Court's basic approach has been "`that sound judicial administration is best advanced if litigants bear their own counsel fees.'" Satellite Gateway Communications, Inc. v. Musi Dining Car Co., Inc., 110 N.J. 280, 285, 540 A.2d 1267 (1988) (quoting State of New Jersey, Dep't of Envtl. Prot. v. Ventron Corp., 94 N.J. 473, 504, 468 A.2d 150 (1983)).
Nevertheless, New Jersey law permits parties to a contract to shift liability for attorneys' fees. See Cohen v. Fair Lawn Dairies, Inc., 86 N.J.Super. 206, 214-16, 206 A.2d 585 (App.Div.), certif. granted, 44 N.J. 412, 209 A.2d 145, aff'd, 44 N.J. 450, 210 A.2d 73 (1965). "However, even where attorney-fee shifting is controlled by contractual provisions, courts will strictly construe that provision in light of the general policy disfavoring the award of attorneys' fees." North Bergen Rex Transp., Inc., supra, 158 N.J. at 570, 730 A.2d 843. Notably, New Jersey cases which uphold enforcement of such fee-shifting provisions generally involve breach of agreements entered into in the commercial setting, such as leases, sale of goods, construction contracts and promissory notes. See Hatch v. T & L Assocs., 319 N.J.Super. 644, 648, 726 A.2d 308 (App.Div.1999) (promissory note); *136 McGuire v. City of Jersey City, 125 N.J. 310, 327, 593 A.2d 309 (1991) (lease); Glenfed Fin. Corp. v. Penick Corp., 276 N.J.Super. 163, 182-83, 647 A.2d 852 (App.Div.1994) (loan agreement), certif. denied, 139 N.J. 442, 655 A.2d 444 (1995); Specialized Med. Sys., Inc. v. Lemmerling, 252 N.J.Super. 180, 185-86, 599 A.2d 578 (App.Div.1991) (sale of goods), certif. granted, 127 N.J. 565, 606 A.2d 375, app. dism. 142 N.J. 443, 663 A.2d 1352 (1992). Freefall has cited no New Jersey case holding that a fee-shifting provision as part of a waiver or release given in a sports activity is enforceable.
Essentially, the fee-shifting clause in Freefall's release/waiver may be construed as an indemnification agreement, whereby plaintiff has agreed to pay counsel fees incurred by Freefall in defending plaintiffs' suit, even if the cause of plaintiff's injuries was Freefall's own negligence. Such agreements, of course, must also be strictly construed against the indemnitee. Ramos v. Browning Ferris Indus. of So. Jersey, Inc., 103 N.J. 177, 191, 510 A.2d 1152 (1986). Nevertheless, we have held "that `there is no essential public policy impediment to an indemnitor undertaking to indemnify the indemnitee in respect of the indemnitee's own negligence.' " Leitao v. Damon G. Douglas Co., 301 N.J.Super. 187, 192, 693 A.2d 1209 (App.Div.), certif. denied, 151 N.J. 466, 700 A.2d 879 (1997) (quoting Doloughty v. Blanchard Constr. Co., 139 N.J.Super. 110, 116, 352 A.2d 613 (Law Div.1976)). However, this public policy statement has generally been applied in the context of indemnification clauses under construction contracts. See Leitao, supra, 301 N.J.Super. at 192-93, 693 A.2d 1209, and cases cited therein. That principle is derived "from the judicial recognition that ordinarily the financial responsibility for the risk of injury during the course of a construction project is shifted in any event by the primary parties to their insurance carriers...." Doloughty, supra, 139 N.J.Super. at 116, 352 A.2d 613.
Against this backdrop, we conclude that the fee-shifting provision in Freefall's agreement is void as against public policy. It obviously runs counter to our strong policy disfavoring fee shifting of attorneys' fees. Clearly, it discourages the average recreational participant from seeking the refuge of our courts for fear that he may face the retribution of a substantial legal fee if he does so. It is one thing to hold a party to a fee-shifting provision in a contract negotiated in a commercial setting; it is another when an amateur sports participant is asked to agree to such a provision shortly before he engages in the activity. The deterrent effect of enforcing such a fee-shifting agreement offends our strong policy favoring an injured party's right to seek compensation when it is alleged that the injury was caused by the tortious conduct of another.
Also significant is the fact that both the FAA and New Jersey's Department of Transportation have recognized that skydiving is a high-risk sport. By regulating the activity, the agencies have made it a matter of public interest that skydiving facilities be licensed and that agency oversight is necessary to assure that the facilities be operated in a safe and compliant manner. To allow an operator to recoup its counsel fees when, as here, the injured party claims that the operator deviated from those regulations, obviously runs counter to that sound policy. See McCarthy, supra, 87 N.J.Super. at 448-49, 209 A.2d 668 (although an immunityclause may be enforceable if it does not contravene public policy, "[t]he situation becomes entirely different in the eyes of the law when the legislation in question is, as here, *137 legislation obviously intended for the protection of human life. In such event, public policy does not permit an individual to waive the protection which the statute is designed to afford him").

IV
We reject Freefall's argument that the trial court erred in denying its application for counsel fees under the Frivolous Claims Statute, N.J.S.A. 2A:15-59.1, and Rule 1:4-8. We cannot say that plaintiffs' complaint was filed in bad faith or that plaintiffs knew or should have known that their complaint was without reasonable basis in law or equity, and could not be supported by a good faith argument under existing law. N.J.S.A. 2A:15-59.1b(1) and 59.1b(2). See also McKeown-Brand v. Trump Castle Hotel & Casino, 132 N.J. 546, 548-49, 626 A.2d 425 (1993). In our view, the validity of the release/waiver agreement signed by plaintiff was at least debatable. See McCarthy, supra, 87 N.J.Super. at 446-47, 209 A.2d 668. Furthermore, because the negligence, rather than recklessness, standard applied to Freefall, plaintiffs' theory based on purported violations of industry standards, though not factually supported, cannot be deemed frivolous. Finally, although we agree with the trial court that ultimately expert testimony was necessary to establish a case against Freefall, that question was at least open to debate when plaintiffs filed their complaint. See Crawn, supra, 136 N.J. at 508-10, 643 A.2d 600 (holding that plaintiff was not required to produce expert testimony to establish tortious conduct of a co-participant in an informal softball game).
Affirmed.
NOTES
[1] Two appeals, A-2629-00T1, filed by plaintiffs, and A-2789-00T1, filed by defendants Freefall and John Eddowes, have been consolidated for purpose of this opinion.
[2] Plaintiff Patricia Dare, Joseph's wife, filed a per quod claim.
[3] Freefall refers also to defendant John Eddowes, part owner of Freefall, and defendant Warren Acorn who, according to plaintiffs' complaint, was a Freefall employee.
[4] The United States Parachute Association, Skydiver's Information Manual § 4.19F (1995), provides:

Right-of-way: The lower person has the right of way, both in freefall and under canopy. The higher person should always yield to anyone below. It is important to avoid collisions at all costs.