643 A.2d 600

MICHAEL CRAWN, PLAINTIFF-RESPONDENT AND CROSS-
APPELLANT, v. JOHN CAMPO, DEFENDANT-
APPELLANT AND CROSS-RESPONDENT.

Argued March 28, 1994—Decided July 21, 1994.

*James M. DeMarzo* argued the cause for appellant and cross-respondent (*O'Donnell, McCord, Helfrich & Bangiola,* attorneys).

*Albert E. Fershing* argued the cause for respondent and cross-appellant (*Shurkin & Fershing,* attorneys).

*Michael J. Cernigliaro* submitted a brief on behalf of *amicus curiae,* New Jersey Defense Association (*Campbell, Foley, Lee, Murphy & Cernigliaro,* attorneys).

The opinion of the Court was delivered by

HANDLER, J.

Plaintiff was playing catcher in a pickup softball game and was injured when defendant, attempting to score from second base, either slid or ran into him at home plate. Plaintiff sued to recover for his personal injuries. The critical issue in this action turns on

the nature of a player's duty to avoid inflicting physical injury on another player.

The issue is directly posed by the competing perspectives of the lower courts. The Law Division determined that the applicable standard governing players engaged in informal sports activity is to avoid injurious conduct that is reckless or intentional. 257 *N.J.Super.* 374, 608 *A.*2d 465 (1992). By contrast, the Appellate Division concluded that the appropriate standard of care is to avoid conduct that would constitute negligence under the circumstances. 266 *N.J.Super.* 599, 630 *A.*2d 368 (1993).

We conclude that the trial court was correct. We now hold that the duty of care applicable to participants in informal recreational sports is to avoid the infliction of injury caused by reckless or intentional conduct.

I

The game took place on May 1, 1988. The players consisted of a group that regularly participated each week, as well as other persons, either friends or bystanders, who joined the game. The composition of the two teams changed from week to week.

The teams were not associated with any league and the games were played without independent umpires or referees. The parties agree that the game was played under the general rules of softball. They disagree, however, whether the group had a rule prohibiting sliding.

Plaintiff's witnesses testified that the group played with a no-slide rule. They were uncertain about when the players first agreed to the rule, but they were certain that by the time the group began playing its weekly game, everyone understood that sliding was prohibited. In fact, whenever a player did slide, the other team invoked the rule.

Plaintiff's witnesses were equivocal about the exact scope of the no-slide rule. Whether the rule was a general no-slide rule or one that merely prohibited runners from purposely running into in-

fielders in order to break up a tag or double play is not clear. Plaintiff's witnesses did agree that the purpose of the rule was to prevent injury. In sharp contrast, defendant's witnesses, including defendant himself, insisted that no rule governed sliding at all.

Defendant was a runner on first base. The batter hit a ground ball to the shortstop, who flipped the ball to the second baseman to get the force-out on defendant. Defendant slid into second base, taking the legs out from beneath the second baseman. Plaintiff's witnesses testified that after that play, the other players reminded defendant that sliding was prohibited. Defendant, according to those witnesses, acknowledged the rule and indicated his willingness to abide by it. Defendant, however, disputed that version of events, testifying that his slide into second base did not result in any warning about sliding.

With defendant now on second, the next batter hit a ball to right field. As the outfielder relayed the ball to the first baseman, defendant rounded third and headed for home. Plaintiff, the catcher, testified that he was standing on the first-base side of home plate, with his left foot touching the right side of the plate. His body was turned toward first ready to receive the relay throw from the first baseman. As defendant approached the plate, he lowered his body and barrelled into plaintiff's left side. Plaintiff reeled backwards and defendant ended up on top of plaintiff's lower leg. Plaintiff heard a pop in his leg and then felt severe pain. Because he was off to the first-base side of the plate, plaintiff claims that defendant had ample room to run past him and touch home plate without making contact. He argues that defendant's motive in deliberately running into him was to dislodge the ball from plaintiff's glove to avoid the out. Defendant, however, testified that when he approached home plate, plaintiff was straddling the plate with a foot on either side. Defendant believed that the only way to reach home plate and to avoid a tag was to slide. He slid feet first into plaintiff's left leg. Although plaintiff later tried to resume play, his left leg collapsed under him when he attempted to run. He was taken from the field to a

hospital, where it was determined that he had suffered a torn knee ligament, which required surgery.

Plaintiff brought this action seeking recovery for his personal injuries. In three separate counts of his complaint, he alleged that defendant was liable because his conduct had been either negligent, reckless, or intentional. Prior to trial, plaintiff voluntarily dismissed the count alleging intentional conduct. The matter proceeded to trial on the issue of liability only. The jury returned a verdict for plaintiff, finding that defendant's conduct had been reckless and that plaintiff had not assumed the risk of reckless conduct. Defendant brought a motion for a new trial. Although the trial court denied defendant's claim that plaintiff should have been required to present expert testimony on the rules and conduct of the game, it granted defendant's motion on other evidentiary grounds.

Following an appeal and cross-appeal, the Appellate Division affirmed the trial court's grant of a new trial, as well as its decision that expert testimony was not required. 266 *N.J.Super.* 599, 630 *A.*2d 368. However, it reversed the trial court on the proper standard required to establish liability for injuries sustained in informal athletic competition. It ruled that the proper standard was reasonableness under the circumstances.

Defendant filed a motion to the Court for leave to appeal the Appellate Division decision on the standard-of-care issue and the need for expert testimony. Plaintiff filed a motion for leave to cross appeal on the affirmance of the grant of a new trial. We granted those motions. 134 *N.J.* 557, 636 *A.*2d 516 (1993).

## II

The majority of jurisdictions that have considered the issue of a person's duty to exercise care to avoid injury when engaged in a sports activity have concluded that to constitute a tort, conduct must exceed the level of ordinary negligence. Most courts have determined that the appropriate duty players owe to one another is not to engage in conduct that is reckless or intentional. *See*

Daniel E. Lazaroff, *Torts & Sports: Participant Liability to Co–Participants for Injuries Sustained During Competition*, 7 *U.Miami Ent. & Sports L.Rev.* 191, 195, 198 (1990) (stating that "[ ]the emerging legal standard requires either recklessness or specific intent to injure by defendant," and that "[m]ost modern courts raise the threshold for tort liability and require proof of reckless behavior.") Mel Narol, *Sports Participation with Limited Litigation: The Emerging Reckless Disregard Standard*, 1 *Seton Hall J. Sport L.* 29, 29–30 (1991) ("A trend has emerged. Courts and legislatures have espoused the view that torts which might be actionable in other arenas if negligence is shown, should ... be actionable in the sports arena [only] if the aggrieved person demonstrates gross negligence or reckless disregard by the defendant.") In *Nabozny v. Barnhill*, 31 Ill.App.3d 212, 334 *N.E.*2d 258 (1975), a soccer goalie in a league for high-school-aged participants, was kicked in the head in the non-contact penalty area. The court concluded that "a player is liable for injury in a tort action if his conduct is such that it is either deliberate, wilful or with a reckless disregard for the safety of the other player so as to cause injury to that player." *Id.*, 334 N.E.2d at 261.

The preference for a standard of care that exceeds negligent conduct is driven by the perception that the risk of injury is a common and inherent aspect of informal sports activity. In *Knight v. Jewett*, 3 *Cal.* 4th 296, 11 *Cal.Rptr.*2d 2, 834 *P.*2d 696 (1992), for example, a player was injured in a game of touch football. The court observed that "the nature of a sport is highly relevant in defining the duty of care owed by the particular defendant ... In some situations, ... the careless conduct of others is treated as an 'inherent risk' of a sport." *Id.*, 11 *Cal.Rptr.*2d at 14, 834 *P.*2d at 708. It concluded that "a participant in an active sport breaches a legal duty of care to other participants ... only if the participant intentionally injures another player or engages in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport." *Id.* at 17, 834 *P.*2d at 711. Similarly, in *Marchetti v. Kalish*, 53 *Ohio St.*3d 95, 559 *N.E.*2d 699 (1990), the court held that partici-

pants in recreational or sports activities assume the ordinary risks of those activities and cannot recover for any injury unless it can be shown that the other participant's actions were either reckless or intentional. *See also Gauvin v. Clark,* 404 *Mass.* 450, 537 *N.E.*2d 94 (1989) (applying reckless disregard of safety standard to injury arising in college hockey game); *Ross v. Clouser,* 637 *S.W.*2d 11, 14 (Mo.1982) (applying recklessness standard to injuries arising from church picnic softball game); *Dotzler v. Tuttle,* 234 *Neb.* 176, 449 *N.W.*2d 774 (1990) (applying wilful-or-reckless-disregard-of-safety standard to injury arising in a pickup basketball game); *Kabella v. Bouschelle,* 100 *N.M.* 461, 465, 672 *P.*2d 290, 294 (Ct.App.1983) (disallowing claim for negligence for injury in recreational football game); *Connell v. Payne,* 814 *S.W.*2d 486 (Tex.Ct.App.1991) (applying reckless standard to injury in recreational polo match). Sometimes courts express the standard of care ambiguously. In *Picou v. Hartford Insurance Co.,* 558 *So.*2d 787, 790 (La.Ct.App.1990), involving a collision between players in a softball game, the court concluded that "participants have the duty to play the game in a reasonable manner, refraining from acts which are unexpected, unforeseeable, *or* which evidence reckless disregard for other players." (Emphasis added.) *Cf. Lestina v. West Bend Mut. Ins. Co.,* 176 *Wis.*2d 901, 501 *N.W.*2d 28 (1993) (adopting standard of negligence under the circumstances for sports torts).

The imposition of a recklessness standard is primarily justified by two policy reasons. One is the promotion of vigorous participation in athletic activities. *See, e.g., Nabozny, supra,* 334 *N.E.*2d at 260 (stating that law should not "place unreasonable burdens on the free and vigorous participation in sports by our youth"); *Ross, supra,* 637 *S.W.*2d at 11; *Kabella, supra,* 100 *N.M.* at 463, 672 *P.*2d at 293; *Marchetti, supra,* 559 *N.E.*2d at 703. The other reason is to avoid a flood of litigation. *See, e.g., Marchetti, supra,* 559 *N.E.*2d at 702 (asserting that failing to apply recklessness standard would "open the floodgates to a myriad of lawsuits involving the backyard games of children").

In this case, the Appellate Division noted the trend in other jurisdictions to impose the higher recklessness or intent-to-harm standard. 266 *N.J.Super.* at 602–04, 630 *A.*2d 368. It concluded, however, that the justifications for the heightened standard—promoting vigorous participation in sports and preventing a flood of litigation—did not outweigh New Jersey's well-established reliance on the ordinary negligence standard and its consequent aversion to tort immunities. *Id.* at 609–11, 630 *A.*2d 368. It held that the standard for determining liability in informal athletic or sports cases was ordinary negligence, that is, reasonableness under the circumstances. *Id.* at 609–12, 630 *A.*2d 368.

■ Anytime a court raises the standard of care that defines the legal duty that is owed for the safety of others, it implicitly immunizes a part of the conduct that otherwise would be considered tortious and actionable. As the Appellate Division here noted, New Jersey tolerates immunities only for important reasons of public policy and in relatively exceptional situations, and therefore strongly endorses a standard of care based on ordinary negligence. 266 *N.J.Super.* at 607–12, 630 *A.*2d 368. In that context the Appellate Division referred to *Mahoney v. Carus Chemical Co.,* 102 *N.J.* 564, 510 *A.*2d 4 (1986), which preserved the immunity of property owners and others from liability based on negligence for injuries sustained by police or firefighting personnel in the course of their duties; and *Foldi v. Jeffries,* 93 *N.J.* 533, 461 *A.*2d 1145 (1983), which accorded parents immunity from liability for injuries resulting from negligent parenting. The Appellate Division explained that the policy considerations that favor and encourage sports activities are not as important as those implicated in the partial immunities of the "firemen's" rule and of parent-child relationships and, consequently, do not warrant an immunity.

The Appellate Division also examined the abolition of interspousal tort immunity in *Merenoff v. Merenoff,* 76 *N.J.* 535, 388 *A.*2d 951 (1978), to demonstrate that immunities are strongly disfavored even when a possibility exists of encouraging baseless

litigation that can arise because of the difficulty in determining whether the underlying conduct is wrongful. Drawing support from *People Express Airlines, Inc. v. Consolidated Rail Corp.*, 100 *N.J.* 246, 495 *A.*2d 107 (1985), the Appellate Division was satisfied that a general negligence standard "sedulously applied" could winnow out non-meritorious claims and was flexible enough to take into account the risks inherent in sports participation and to ascertain the reasonableness of a defendant's conduct involving "simple [athletic] carelessness." 266 *N.J.Super.* at 607–09, 612, 630 *A.*2d 368.

We recently stated in *Dunphy v. Gregor*, 136 *N.J.* 99, 108, 642 *A.*2d 372, 376 (1994), that "[t]he imposition of a duty is the conclusion of a rather complex analysis that considers the relationship of the parties, the nature of the risk—that is, its foreseeability and severity—and the impact the imposition of a duty would have on public policy." Recognition of a duty of care, ultimately, rests on considerations of public policy and on notions of fairness. *E.g., Carey v. Lovett*, 132 *N.J.* 44, 622 *A.*2d 1279 (1993); *Hopkins v. Fox & Lazo*, 132 *N.J.* 426, 625 *A.*2d 1110 (1993); *Kelly v. Gwinnell*, 96 *N.J.* 538, 544, 476 *A.*2d 1219 (1984). That multi-faceted analysis, focusing on personal relationships, the nature of risks, and considerations of public policy and fairness, is one that must inform our determination of this case. Based on that analysis, we conclude that liability arising out of mutual, informal, recreational sports activity should not be based on a standard of ordinary negligence but on the heightened standard of recklessness or intent to harm.

We concur substantially in the Appellate Division's determination that considerations of public policy and notions of fairness do not impel a protection of sports activity in the form of a broad tort immunity. Concededly, informal athletic and recreational sports activities are quite important, as evidenced by their universal popularity in all walks and in all stages of life. To that extent a societal interest is served by encouraging the vigorous participation in sports activity. That societal interest, however,

does not itself demand that wrongful conduct by the participants in such activity that foreseeably results in injury to others should be totally removed from the law of torts. That kind of sweeping immunity, we are satisfied, is not justified.

The more perplexing inquiry is whether informal recreational sports activity, given its societal importance, should be accorded a partial immunity that effectively exempts from liability conduct that is simply negligent, unreasonable, or careless, and sanctions liability only for behavior that is more egregious. Arguably, considerations of public policy and fairness as evidenced, at least indirectly, by legislative policy, support such a limited or partial immunity. *See, e.g., N.J.S.A.* 2A:62A–6 (setting forth tort immunity for volunteer athletic coaches for injuries to participants except when conduct is wilful, wanton, or grossly negligent); *N.J.S.A.* 2A:62A–6.1 (providing immunity for those accredited for sports officiating except when conduct is wilful, wanton, or grossly negligent). Those partial statutory immunities are reflective of public policy and may serve as a guide to the evolution of related common law immunities. *See Buckley v. Estate of Pirolo,* 101 *N.J.* 68, 82, 500 *A.*2d 703 (1985) (O'Hern, J., concurring); *Renz v. Penn Cent. Corp.,* 87 *N.J.* 437, 456, 435 *A.*2d 540 (1981).

The concerns that focus on the relationship among participants and the nature of the risks that surround informal sports activity are equally germane to defining the appropriate duty of care. Participation in recreational sports activities has unique aspects that separate such sports from other common activities. In many recreational sports, softball included, some amount of physical contact is expected. Physical contact is an inherent or integral part of the game in many sports. *See Gauvin, supra,* 537 *N.E.*2d at 96 ("Players, when they engage in sport, agree to undergo some physical contacts which could amount to assault and battery absent the players' consent.") The degree of physical contact allowed varies from sport to sport and even from one group of players to another. In addition, the physicality of sports is accompanied by a high level of emotional intensity. *Ross, supra,*

637 *S.W.*2d at 14 (noting "proper fervor" of competition); *see* Lazaroff, *supra,* 7 *U.Miami Ent. & Sports L.Rev.* at 195 (noting difficulty of distinguishing "between negligence and recklessness in the context of a game where players are encouraged to play with reckless abandon"); *Lestina, supra,* 501 *N.W.*2d at 35 (Wilcox, J., dissenting) (noting that although defendant's conduct "clearly violated a rule of the game," conduct occurred in "heat of the game" and should not subject defendant to negligence liability).

Our analysis is further complicated by the wide variation in expectations regarding the physical contact and emotional intensity that are appropriate from sport to sport and from game to game. *See Hanson v. Kynast,* 38 *Ohio App.*3d 58, 526 *N.E.*2d 327, 333 (Ohio Ct.App.1987) (Milligan, P.J., concurring) ("[F]oreseeability [of conduct] is dependent upon such factors as the nature of the sports involved, the rules and regulations which govern the sport, the customs and practices which are generally accepted and which have evolved with the development of the sport, and the facts and circumstances of the particular case.").

The court in *Nabozny* expressed the view that sports are governed by two types of rules. One type aims to increase the quality of the game and the other type is designed primarily to protect participants from serious injury. The court determined that when a recognized set of rules governs the competition, every player is charged with a legal duty to refrain from conduct proscribed by a safety rule. Thus, in setting forth the standard for liability, the court stated that "a player is ... charged with a legal duty to every other player on the field to refrain from conduct proscribed by a safety rule." 334 *N.E.*2d at 260–61. *See Kabella, supra,* 100 *N.M.* at 463, 672 *P.*2d at 292 (basing imposition of recklessness standard on implied-consent theory but noting that participation in contact sports does not constitute consent to contact prohibited by safety rules).

Nevertheless, other courts and commentators have acknowledged that violations of rules, even of rules imposed for safety

reasons, are often a "part of the game." *See Knight, supra,* 11 *Cal.Rptr.*2d at 16, 834 *P.*2d at 710 ("The cases [imposing a recklessness standard] have recognized that, in ... a [contact] sport, even when a participant's conduct violates a rule of the game and may subject the violator to internal sanctions prescribed by the sport itself, imposition of *legal liability* for such conduct might well alter fundamentally the nature of the sport...."); *Turcotte v. Fell,* 68 *N.Y.*2d 432, 510 *N.Y.S.*2d 49, 502 *N.E.*2d 964 (1986) ("If the risks of the activity are fully comprehended or perfectly obvious, plaintiff has consented to them and defendant has performed its duty."); *Oswald v. Township High School Dist.,* 84 *Ill.App.*3d 723, 40 *Ill.Dec.* 456, 406 *N.E.*2d 157, 160 (1980) (justifying imposition of recklessness standard because "rule infractions, deliberate or unintentional, are virtually inevitable in contact games"); *Lazaroff, supra,* 7 *U.Miami Ent. & Sports L.Rev.* at 223 ("At some point, practices that technically violate safety rules become part of the accepted behavior of a sport.").

Despite those factors, which both typify and complicate informal recreational sports activity, the Appellate Division felt that a standard of care based on negligence would suffice as a basis for liability. It believed that courts could adequately evaluate sports conduct and make clear to juries that "[a] co-participant who creates only risks that are 'normal' or 'ordinary' to the sport acts as a 'reasonable [person] of ordinary prudence under the circumstances.'" 266 *N.J.Super.* at 607, 630 *A.*2d 368 (quoting *Ambrose v. Cyphers,* 29 *N.J.* 138, 144, 148 *A.*2d 465 (1959)).[1]

---

[1] The Appellate Division, following the lead of the Wisconsin Supreme Court in *Lestina, supra,* 501 *N.W.*2d at 33, listed factors that could be considered in determining whether conduct was reasonable, namely,

what sport was involved; whether it was a professional game or an amateur contest; ... whether the sport was conducted pursuant to a recognized set of rules, an informal set of rules, or no rules at all; whether the injurious conduct violated a rule of the contest and, if so, whether the rule was designed for the participants' safety; what was the ultimate purpose of the game and what were the customary methods of winning it; what were the ages, physical characteristics and skills of the participants; what knowledge

The problem with the court's analysis lies in the extraordinary difficulty in judging conduct that is based on limitless variables with respect to how the same game is played among different groups of people. The relationship among sports participants is derived from a consensual arrangement that involves both articulated and unarticulated rules, obvious and obscure conventions, and clear and not-so-clear expectations. Some rules are broken, yet their transgression is tolerated. Certain practices are customary yet others are followed inconsistently. Some conventions are well understood, others are not always known or appreciated by all participants. Each player's expectations are often subjective, and may not be shared or experienced by others in the same way.

■  The reasonableness of conduct that occurs within a consensual relationship can be fairly evaluated only by reference to the nature of the consent and mutual understanding of the persons in the relationship and to the common expectations that serve to identify what conduct is acceptable among those persons. Both *Merenoff* and *Foldi* become instructive in that light. Those cases indicate that if acceptable conduct cannot be recognized except by looking to the highly subjective understandings between persons in a special relationship, the standard of general reasonableness is not truly workable. That is because conduct that is highly subjective cannot be reliably equated with the conduct of an average person under like circumstances.

■  Realistically, complete agreement among the eighteen or twenty persons engaged in playing a softball game covering the limitless kinds of physical contact that can occur in the course of the game can rarely, if ever, be found. That consideration indicates that a legal duty of care based on the standard of what, objectively, an average reasonable person would do under the

---

of the rules and customs of the game the participants possessed; what degree of competitiveness the activity involved; and what relationship the participants' conduct bore to the ultimate purpose of the contest.
[266 *N.J.Super.* at 612–13, 630 *A.2d* 368.]

circumstances is illusory, and is not susceptible to sound and consistent application on a case-by-case basis. Accordingly, we hold that the duty of care in establishing liability arising from informal sports activity should be based on a standard that requires, under the circumstances, conduct that is reckless or intentional.

Our conclusion that a recklessness standard is the appropriate one to apply in the sports context is founded on more than a concern for a court's ability to discern adequately what constitutes reasonable conduct under the highly varied circumstances of informal sports activity. The heightened standard will more likely result in affixing liability for conduct that is clearly unreasonable and unacceptable from the perspective of those engaged in the sport yet leaving free from the supervision of the law the risk-laden conduct that is inherent in sports and more often than not assumed to be "part of the game."

One might well conclude that something is terribly wrong with a society in which the most commonly-accepted aspects of play—a traditional source of a community's conviviality and cohesion—spurs litigation. The heightened recklessness standard recognizes a commonsense distinction between excessively harmful conduct and the more routine rough-and-tumble of sports that should occur freely on the playing fields and should not be second-guessed in courtrooms.

## III

Defendant contends that expert testimony is essential to establish the standard of care that applies to the players in a softball game. We agree with the trial court's and Appellate Division's conclusions that expert testimony to establish the applicable standard of care governing a softball game is not required. With few exceptions,

there is no general rule or policy *requiring* expert testimony as to the standard of care.... The test of need of expert testimony is whether the matter to be dealt

with is so esoteric that jurors of common judgment and experience cannot form a valid judgment as to whether the conduct of the party was reasonable.

[*Butler v. Acme Markets, Inc.*, 89 *N.J.* 270, 283, 445 *A.*2d 1141 (1982) (citations omitted).]

■ A duly-qualified expert *may* be presented to a jury "if it will genuinely assist the jury in comprehending the evidence and determining issues of fact." *State v. Odom*, 116 *N.J.* 65, 70, 560 *A.*2d 1198 (1989). The admissibility of expert testimony turns not on

whether the subject matter is common or uncommon or whether many persons or few have knowledge of the matter, but [on] whether the witnesses offered as experts have peculiar knowledge or experience not common to the world which renders their opinions founded on such knowledge or experience an aid to the court or jury in determining the questions at issue.

[*Rempfer v. Deerfield Packing Corp.*, 4 *N.J.* 135, 141–42, 72 *A.*2d 204 (1950).]

■ Thus, the opinion of an expert *can* be admitted in evidence if it pertains to a subject that is "beyond the understanding of the average person of ordinary experience, education, and knowledge." *Odom, supra*, 116 *N.J.* at 71, 560 *A.*2d 1178.

Some sports-injury cases from other jurisdictions appear to have allowed the introduction of expert testimony. See, *e.g., Nabozny, supra*, 334 *N.E.*2d at 260; *Picou, supra*, 558 *So.*2d at 791. Those cases, however, involved games played in organized leagues with umpires or referees, and coaches; also the games were governed by a set of specific rules or conventions of which an expert had knowledge that was not generally shared by the average person or even fully understood by all the participants. Further, nothing in those cases indicated that such expert evidence was essential and mandated; rather, it was merely permitted.

In an informal game, the players themselves determine the particular rules and conventions that apply to their game. A witness, although otherwise qualified as an expert by virtue of specialized education, training, or experience to testify on the rules that generally govern a sport, would not thereby be qualified as an expert on a specific game. Thus, even though the witness

might have comprehensive general knowledge of the game of softball, that would not constitute the requisite "peculiar knowledge" relating to a specific game, and would therefore not constitute the kind of knowledge that would "aid . . . the court or jury in determining" the standard of care governing the playing of that game. *Rempfer, supra,* 4 *N.J.* at 142, 72 *A.*2d 204.

Experience gained from observing or participating in recreational athletics does not translate into the specialized expertise on the rules and conventions that govern a specific informal game and that constitute the basis for the duty of care that the participants in such a game owe to one another. As observed by the court in *Dotzler, supra,* 449 *N.W.*2d at 779–80, even though a self-proclaimed expert claimed to have played 15,000 to 20,000 games of various styles of basketball, "the witness' understanding of how he normally played pickup basketball was not relevant to whatever rules the participants on this day were following." Although the idiosyncracies of a specific softball game render it resistant to the analysis of general experts, the widespread familiarity with softball ensures that the rules and conventions of a particular game, as expressed and explained by its participants, will be comprehensible to jurors of average experience and intelligence.

## IV

The trial court granted defendant's motion for a new trial, basing its decision on the combined effect of three factors: the denial of defendant's use of a prior inconsistent statement by one of plaintiff's witnesses; the refusal to require plaintiff to turn over to defendant for use in cross-examination statements signed by three of plaintiff's witnesses that had been prepared for an earlier arbitration proceeding; and improper comments by plaintiff's attorney regarding plaintiff's loss of wages and unpaid medical bills resulting from the injury. The court determined that those factors had resulted "in a manifest denial of justice." The Appellate Division, finding support in the record for trial court's deter-

mination, upheld it decision to grant a new trial.  266 *N.J.Super.* at 601, 630 *A.*2d 368.

Defendant attempted at trial to use a prior inconsistent statement of one of plaintiff's witnesses.  The court determined that the defense could not use the statement because defendant had violated *Rule* 4:17–7 by failing to amend its interrogatories to reflect its possession of that statement.  *See Westphal v. Guarino,* 163 *N.J.Super.* 139, 145, 394 *A.*2d 377 (App.Div.) (noting that exclusion of evidence is proper sanction for violation of *Rule* 4:17–7), *aff'd o.b.,* 78 *N.J.* 308, 394 *A.*2d 354 (1978).

Defendant also sought to use certain prior statements of several of plaintiff's witnesses.  The statements of the witnesses were identical, consisting of a brief description of plaintiff's view of the critical events.  The court ruled that defendant could not use those statements on cross-examination.

Finally, because plaintiff's cause of action was bifurcated into liability and damages phases, an issue arose at the liability trial regarding the extent to which plaintiff's counsel could comment on the severity of plaintiff's injury.  In his opening statement plaintiff's counsel referred to the severity and economic consequences of plaintiff's injury.  Defendant moved for a mistrial, but the court denied his motion.

The trial court's initial rulings to preclude the use of the prior statements and to find the improper comments of plaintiff's counsel insufficiently harmful to warrant a new trial were properly within the scope of the court's discretion.  The trial court, however, in considering the motion for a new trial determined that his initial rulings were in error and cumulatively were sufficiently prejudicial to result in a denial of justice.

The trial court in expressing its determination to grant a new trial applied the correct standard, *viz:* "The trial judge shall grant the motion [for a new trial] if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscar-

riage of justice under the law." *R.* 4:49–1(a). This Court has characterized the standard for authorizing a new trial as one that requires a determination that the jury's verdict is "contrary to the weight of the evidence or clearly the product of mistake, passion, prejudice or partiality." *Lanzet v. Greenberg,* 126 *N.J.* 168, 175, 594 *A.*2d 1309 (1991).

The Appellate Division could fairly conclude that the trial court did not abuse its discretion on consideration of the motion for a new trial by finding that its earlier rulings had been in error and cumulatively had created undue prejudice. The initial rulings were made at different times during the course of the trial. The court reasonably reevaluated those rulings in the context of a completed trial in determining that the earlier rulings, although within its discretionary authority, were ultimately shown to be erroneous. The pivotal consideration concerns the evidentiary impact of the court's rulings on the critical issue of witness credibility. The trial court was in the best position to assess fully the credibility of the witnesses in relation to the evidence adduced at trial. Deference should be accorded to the trial court's conclusion concerning the prejudice attributable to the defense's inability to use the prior statements of witnesses for purposes of cross-examination, as well to counsel's comments, and the extent to which that prejudice contributed to an unjust result.

We thus find no basis to disturb the determinations of the lower courts with respect to the grant of a new trial.

## IV

The judgment of the Appellate Division is modified and, as modified, is affirmed.

*For modification and affirmance*—Justices POLLOCK, O'HERN, GARIBALDI, HANDLER and STEIN—5.

*Opposed*—None.