

FILED

Nov 15 2016, 5:37 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Karl N. Truman
Marsha A. Dailey
Jeffersonville, Indiana

ATTORNEYS FOR APPELLEE

Rodney L. Scott
Eric T. Eberwine
Waters Tyler Hofmann & Scott, LLC
New Albany, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| David D. Wooten, <br><br> *Appellant-Plaintiff,* <br><br> v. <br><br> Caesars Riverboat Casino, LLC and Bernard J. Chamernik, <br><br> *Appellees-Plaintiffs.* | November 15, 2016 <br><br> Court of Appeals Case No. 31A04-1605-CT-1037 <br><br> Appeal from the Harrison Superior Court <br><br> The Honorable Larry Medlock, Special Judge <br><br> Cause No. 31D01-1311-CT-39 |

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Plaintiff, David D. Wooten (Wooten), appeals the trial court's summary judgment in favor of Appellee-Defendant,[1] Bernard J. Chamernik (Chamernik), which concluded, as a matter of law, that Chamernik's actions fell within the range of ordinary behavior of participants in the sport of golf.

We affirm.

## ISSUE

Wooten raises two issues on appeal, which we consolidate and restate as: Whether the trial court properly concluded that Chamernik's conduct of driving the golf cart during a golf scramble fell within the ordinary range of behavior of participants in golf, as interpreted by our supreme court in *Pfenning v. Lineman*, 947 N.E.2d 392 (Ind. 2011).

## FACTS AND PROCEDURAL HISTORY

This case stems from an incident that occurred between two participants at a VIP golf scramble at Chariot Run Golf Course, in Harrison County, Indiana. On August 19, 2012, Wooten and Chamernik were invited to participate in a golf tournament sponsored by Caesars Riverboat Casino (Caesars) at its golf course, Chariot Run Golf Course (Chariot Run). According to the event rules,

---

[1] The caption on this cause also lists Caesars Riverboat Casino, LLC (Caesars) as Appellee-Defendant. However, the case against Caesars was settled between the parties and accordingly, Caesars is no longer a party on appeal.

the golf scramble consisted of teams of four golfers, with the team playing the best ball for each shot. Caesars paired Wooten, Chamernik, James Malles (Malles), and James North (North), none of whom knew each other, as partners for the scramble. Wooten was the only one who had previously played at Chariot Run and who was familiar with its layout. Caesars provided all teams with golf carts—Wooten and Malles rode in one golf cart and Chamernik and North rode in a second golf cart behind them. Although Chariot Run features paved asphalt paths for the golf carts, participants were allowed to "drive the carts on the fairway" and to pull the "cart up close to where [the] ball was and hit it." (Appellant's App. p. 71).

[5] Wooten's team started the scramble at the twelfth hole. The fourteenth hole was a blind shot from the tee, after which Malles and Wooten rode ahead in their cart on the cart path. Chamernik followed behind, while looking for his ball on the fairway. Malles stopped the golf cart on the path near the green on the downward slope of a hill. Wooten was "leaning up to get out of the cart" when it was hit from behind by Chamernik "at a low rate of speed." (Appellant's App. pp. 76, 141). The impact of the collision "threw [Wooten] backwards," but he did not leave his seat and was not otherwise thrown out of the golf cart. (Appellant's App. p. 83). Wooten's neck "snapped backwards" and started "bothering" him, and his ears started ringing. (Appellant's App. p. 84). Wooten "sat in the cart for several minutes." (Appellant's App. p. 84). He took some over the counter pain reliever and continued to play. There was no damage to either golf cart as a result of the incident.

[6]     After completing the play on the eighteenth hole, Malles drove Wooten to the clubhouse where Wooten informed course attendants about the accident. Malles and Wooten did not enter the clubhouse but instead waited in their golf cart for the arrival of the EMTs, while parked under a canopy outside. By this time, Wooten was also experiencing blurred vision. After examining Wooten, the EMTs diagnosed him with whiplash and cleared him to play without any further treatment. Wooten participated in the remainder of the tournament, with his team winning first place. Because of continuing pain, Wooten checked himself into the hospital on August 24, 2012, where he was diagnosed with a neck sprain and strain.

[7]     On November 20, 2013, Wooten filed his Complaint sounding in negligence against Caesars, Chamernik, and Malles. Malles was subsequently dismissed from the cause on February 24, 2016, and Wooten settled with Caesars. On February 26, 2016, Chamernik filed his motion for summary judgment, memorandum in support thereof, and designation of evidence. Wooten filed a reply on March 14, 2016. On April 1, 2016, the trial court conducted a hearing on Chamernik's summary judgment motion, which was summarily granted on April 15, 2016.

[8]     Wooten now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

[9]     Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C). "A fact is material if its resolution would affect the outcome of the case, and an issue is genuine if a trier of fact is required to resolve the parties' differing accounts of the truth . . . , or if the undisputed facts support conflicting reasonable inferences." *Williams v. Tharp*, 914 N.E.2d 756, 761 (Ind. 2009).

[10]    In reviewing a trial court's ruling on summary judgment, this court stands in the shoes of the trial court, applying the same standards in deciding whether to affirm or reverse summary judgment. *First Farmers Bank & Trust Co. v. Whorley*, 891 N.E.2d 604, 607 (Ind. Ct. App. 2008), *trans. denied*. Thus, on appeal, we must determine whether there is a genuine issue of material fact and whether the trial court has correctly applied the law. *Id*. at 607-08. In doing so, we consider all of the designated evidence in the light most favorable to the non-moving party. *Id*. at 608. The party appealing the grant of summary judgment has the burden of persuading this court that the trial court's ruling was improper. *Id*. When the defendant is the moving party, the defendant must show that the undisputed facts negate at least one element of the plaintiff's cause of action or that the defendant has a factually unchallenged affirmative defense that bars the plaintiff's claim. *Id*. Accordingly, the grant of summary judgment must be reversed if the record discloses an incorrect application of the law to the facts. *Id*.

We observe that in the present case, the trial court did not enter findings of fact and conclusions of law in support of its judgment. Special findings are not required in summary judgment proceedings and are not binding on appeal. *AutoXchange.com. Inc. v. Dreyer and Reinbold, Inc.*, 816 N.E.2d 40, 48 (Ind. Ct. App. 2004). However, such findings offer this court valuable insight into the trial court's rationale for its judgment and facilitate appellate review. *Id.*

## II. *Analysis*

Wooten contends that the trial court erred when it granted summary judgment to Chamernik on Wooten's negligence Complaint. In particular, Wooten asserts that the designated evidence establishes that Chamernik's action during the golf game was outside the range of ordinary behavior of participants in golf.

In order to prevail on a claim of negligence, a plaintiff is required to prove: (1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty by the defendant; and (3) an injury to the plaintiff proximately caused by the breach." *Peters v. Forster*, 804 N.E.2d 736, 738 (Ind. 2004). In negligence cases, summary judgment is "rarely appropriate." *Rhodes v. Wright*, 805 N.E.2d 382, 387 (Ind. 2004). "This is because negligence cases are particularly fact sensitive and are governed by a standard of the objective reasonable person—once best applied by a jury after hearing all of the evidence." *Id.* Nevertheless, a defendant is entitled to judgment as a matter of law when the undisputed material facts negate at least one element of the plaintiff's claim. *Id.* at 385.

[14] The duty of care owed by participants in athletic events was recently addressed by our supreme court in its pivotal opinion of *Pfenning v. Lineman*, 947 N.E.2d 392 (Ind. 2011), which settled Indiana case law's diverse approaches to liability for sport injuries. In *Pfenning*, Cassie Pfenning was injured by a golf ball at a golf outing when she was sixteen years old. *Id*. at 396. At the time of the incident, Pfenning drove a beverage cart and after making several trips around the golf course "was suddenly struck in the mouth by a golf ball while driving the beverage cart on the cart path approaching the eighteenth hole's tee pad from its green." *Id*. at 397. The ball was a low drive from the sixteenth tee approximately eighty yards away. *Id*. The golfer's drive traveled straight for approximately sixty to seventy yards and then severely hooked to the left. *Id*. The golfer noticed the roof of another cart in the direction of the shot and shouted "fore." *Id*. But neither the plaintiff nor her beverage-serving companion heard anyone shout "fore." *Id*. After hearing a faint yelp, the golfer ran in the direction of the errant ball and discovered the plaintiff with injuries to her mouth, jaw, and teeth. *Id*.

[15] Pfenning brought an action against Lineman, the golfer who hit the ball that struck her. *Id*. at 396. Lineman sought summary judgment on the ground that he could not be held liable under a negligence theory because the plaintiff was a co-participant in the sporting event, and her injuries resulted from an inherent risk of the sport. *Id*. at 398. The trial court granted summary judgment in favor of the defendant. *Id*. at 396. On appeal, our supreme court "reject[ed] the concept that a participant in a sporting event owes no duty of care to protect

others from inherent risks of the sport," and adopted "instead the view that summary judgment is proper when the conduct of a sports participant is within the range of ordinary behavior of participants in the sport and therefore is reasonable as a matter of law." *Id*. at 396.

[16]     The supreme court held:

> We conclude that sound judicial policy can be achieved within the framework of existing Indiana statutory law and jurisprudence. As noted previously, there are three principal elements in a claim for negligence: duty, breach of duty, and a proximately caused injury. When there is no genuine issue of material fact and any one of these elements is clearly absent, summary judgment is appropriate. But rather than focusing upon the inherent risks of a sport as a basis for finding no duty, which violates Indiana statutory and decisional law, the same policy objectives can be achieved without inconsistency with statutory and case law by looking to the element of breach of duty which is determined by the reasonableness under the circumstances of the actions of the alleged tortfeasor. Breach of duty usually involves an evaluation of reasonableness and thus is usually a question to be determined by the finder of fact in negligence cases. But in cases involving sports injuries, and in such cases only, we conclude that a limited new rule should apply acknowledging that reasonableness may be found by the court as a matter of law. As noted above, the sports participant engages in physical activity that is often inexact and imprecise and done in close proximity to others, thus creating an enhanced possibility of injury to others. The general nature of the conduct reasonable and appropriate for a participant in a particular sporting activity is usually commonly understood and subject to ascertainment as a matter of law. []
> 
> We hold that, in negligence claims against a participant in sports activity, if the conduct of such participant is within the range of

> ordinary behavior of participants in the sport, the conduct is reasonable and does not constitute a breach of duty.
>
> In any sporting activity, however, a participant's particular conduct may exceed the ambit of such reasonableness as a matter of law if the participant either intentionally caused injury or engaged in reckless conduct. Such intentional or reckless conduct may be found to be a breach of duty.

*Id*. at 403-04 (internal references and footnote omitted). Turning to the facts before it, the *Pfenning* court found that "hitting an errant drive" and "a golfer's yelling 'fore' or failure to do so, and the manner of doing so," fell within the range of ordinary behavior for golfers. *Id*. at 404.

[17] Following *Pfenning*, this court issued *Welch v. Young*, 950 N.E.2d 1283 (Ind. Ct. App. 2011), which addressed the issue whether a batter's practice swings were within the range of ordinary behavior of participants in baseball. Welch, a little league "team mom," was injured when a young batter was warming up with practice swings outside the dugout. *Id*. at 1285. The bat hit Welch's knee. *Id*. Granting summary judgment for the batter, the trial court concluded that, as a "team mom," Welch was a participant who "incurred the risk of injury when she stood in the area between the dugout and the opening in the fence." *Id*. at 1285-86. Therefore, Welch's injury was "due to risks inherent in the sporting event[.]" *Id*. at 1286.

[18] Applying the new guidelines for sports injuries in a negligence action, the *Welch* court noted on appeal that "[a]fter *Pfenning*, then, the analysis of an injury like that before us is based not on the status of the plaintiff as a participant or spectator, or her incurrence of risk. Rather, the analysis should address

whether the conduct of the defendant is within the range of ordinary behavior of participants in the sport." *Id.* at 1289. Because our supreme court "offered little guidance as to the meaning of its new rule," the court looked at "other courts for helpful insights." *Id.* As such, the *Welch* court was mindful that "physical contact is an inherent or integral part of the game in many sports. The degree of physical contact allowed varies from sport to sport and even from one group of players to another." *Id*. (citing *Crawn v. Campo*, 643 A.2d 600, 605 (N.J. 1994)). Guided by the New Hampshire Supreme Court, the *Welch* court

> noted a number of factors that may help determine the reasonableness of behavior by participants, sponsors, and organizers of recreational athletics: (1) the nature of the sport involved; (2) the type of contest, *i.e.,* amateur, high school, little league, pick-up, etc.; (3) the ages, physical characteristics, and skills of the participants; (4) the type of equipment involved; and (5) the rules, customs, and practices of the sport, including the types of contact and the level of violence generally accepted.

*Id*. (citing *Allen v. Dover Co-Recreational Softball League*, 807 A.2d 1274, 1285-86 (N.H. 2002)). Upon appellate review, the decision of the trial court was reversed, as the court was "faced with factual issues about 'the conduct of [the] participant' that preclude[d] our determination whether, as a matter of law, his conduct was 'within the range of ordinary behavior of participants in the sport.'" *Id*. (citing *Pfenning*, 947 N.E.2d at 404). Specifically, we noted the factual issues as to whether the injury took place on the field or outside the

playing area, and whether the game was underway or had not yet started. *Id.* at 1292.[2]

[19] Focusing on the designated evidence, Wooten contends that "[c]rashing a golf cart into another golf cart is not within the range of ordinary behavior." (Appellant's Br. p. 8). He maintains that because "golf carts are not necessary for playing the game of golf[,] it cannot be said that golf-cart activities are ordinary behavior or are an inherent risk in the game of golf." (Appellant's Br. p. 8).

[20] As the sport gained in popularity within the last couple of years, the use of golf carts in golf outings has become ubiquitous and a rather mundane occurrence on the fairway because walking "would just slow things up." (Appellant's App. p. 134). As recognized by Justice Stevens in *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 683, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001):

> As an initial matter, we observe that the use of carts is not itself inconsistent with the fundamental character of the game of golf. From early on, the essence of the game has been shotmaking—using clubs to cause a ball to progress from the teeing ground to a hole some distance away with as few strokes as possible. . . . Originally, so few clubs were used that each player could carry them without a bag. Then came golf bags, caddies, carts that were pulled by hand, and eventually motorized carts that carried players as well as clubs. Golf carts started appearing with increasing regularity on American golf courses in the 1950's. Today they are everywhere. And they are encouraged. For one thing, they often speed up play, and for another, they are great

---

[2] The most recent pronouncement in this area of law is *Megenity v. Dunn*, 55 N.E.3d 367 (Ind. Ct. App. 2016), which was granted transfer by our supreme court on September 1, 2016.

revenue producers. There is nothing in the Rules of Golf that either forbids the use of carts or penalizes a player for using a cart. That set of rules, as we have observed, is widely accepted in both the amateur and professional golf world as the rules of the game.

[21] At Chariot Run, "[a]ll the teams in this particular golf scramble were using carts" provided by Caesars. (Appellant's App. p. 134). When Wooten's team arrived at the fourteenth hole, they all teed off from a blind shot. Trying to locate where their golf balls had landed, Malles and Wooten rode ahead in their cart, while Chamernik followed behind in the second cart, and North walked the fairway in search for his ball which might have landed in the creek. In his designated deposition, Chamernik testified that "as we're coming over the hill my focus in on the fairway to see where my shot was and how close it was to the green." (Appellant's App. p. 115). He explained that it is not "unusual for a golfer to look for the ball from the cart" and is "part of the game." (Appellant's App. p. 134). Malles affirmed that "[i]t is common part of the game of golf for golfers to look for their ball while operating a golf cart on the course." (Appellant's App. p. 141).

[22] However, by the time Chamernik "looked back straight ahead," he noticed that Malles and Wooten "had stopped [] and that's when [he] hit their cart." (Appellant's App. pp. 115-16). Malles confirmed that Chamernik "struck the rear of [his] golf cart at a low rate of speed while [he] was stopped." (Appellant's App. p. 141). Wooten testified in his deposition that he did not "know how fast [Chamernik] was going," but the impact "did not move [the cart] dramatically." (Appellant's App. pp. 81, 82). Wooten conceded that he has "been at golf courses before [] where people bump into you a little bit, and

it's no big deal." (Appellant's App. p. 99). He clarified that "I don't recall how many times [I've been in a golf cart accident] but anybody that's played golf a lot, the person behind them has eased up into them and bumped the cart." (Appellant's App. p. 99). Malles "did not see any damage to either golf cart, nor did Wooten "complain to [him] about tinnitus or blurred vision after the accident." (Appellant's App. p. 141).

[23] As noted by our Supreme Court, the golf cart has become part and parcel of the modern golf game, with an unremitting presence on the fairway. Wooten himself admitted that it has become common and expected for golf carts to bump into each other. Accordingly, even though incidents of this sort might be actionable during non-golf related activities, this conduct, like hitting an errant drive or the lack of yelling 'fore' in *Pfenning*, has now become "within the range of ordinary behavior of participants" in golf and therefore, as a matter of law, it cannot support a claim for negligence. *See Pfenning*, 947 N.E.2d at 404. However, "[i]n any sporting activity, a participant's particular conduct may exceed the ambit of such reasonableness as a matter of law if the participant either intentionally caused injury or engaged in reckless conduct." *Id*. at 404. Nevertheless, the designated evidence fails to establish any recklessness or intent on the part of Chamernik when driving the golf cart. While Wooten did not notice Chamernik's speed, Malles testified that the cart was struck in the rear "at a low rate of speed." (Appellant's App. p. 2). Wooten only confirmed that its impact did not move the cart dramatically. There is no evidence that

Chamernik had been involved in any horseplay or other questionable behavior while driving the golf cart.

[24] Acknowledging the policy considerations on which *Pfenning* is grounded, we recognize that encouragement to participate in golf implicitly discourages excessive litigation of claims by persons who suffer injuries from participants' conduct. The inclusion of golf carts in the sport is "commonly understood" and while an inexact operation of a cart may somewhat "increase the normal risks attendant to the activities of ordinary life outside the sports arena, it does not render unreasonable the ordinary conduct" within the golf game, in the absence of intent or recklessness. *See id*. at 403. Therefore, we affirm the trial court's summary judgment in favor of Chamernik.

## CONCLUSION

[25] Based on the foregoing, we conclude that the trial court properly entered summary judgment on Chamernik's motion.

[26] Affirmed.

[27] Bailey, J. and Barnes, J. concur